This detinue action involves the ownership of a diamond ring valued at about $35,000.00 Finding both parties innocent of any wrongdoing, the trial court ordered the ring to be sold and the proceeds divided between the two parties. Both parties appealed the judgment. The sale of the ring has been suspended pending disposition of these appeals. We reverse and remand with directions.
The plaintiff, David J. Bischoff, filed an action in detinue against the defendant, Albert F. Thomasson, to recover in specie a large platinum ring with diamonds belonging to Bischoff, or, in the alternative, to recover the fair market value of the ring at the time of the alleged conversion by Thomasson. Thomasson counterclaimed, seeking a judgment that he is the owner of the ring, or in the alternative, awarding damages of $27,000.00, resulting from Bischoff's negligence in his handling of the ring. In a nutshell, Bischoff had placed the ring with Candido Martinez, a diamond broker, to find a buyer. In the meantime, Martinez obtained a $35,000.00 business loan, guaranteed by Thomasson in return for a $5,000.00 *Page 361 
fee and a pledge of the ring and other jewels. When Martinez defaulted on the loan, Thomasson paid off the loan and then took possession of the ring in satisfaction of Martinez's obligation to pay the loan balance of $18,139.46, and Thomasson's $5,000.00 fee.
Thomasson explicitly raised several affirmative defenses in his pleadings, primarily that his title to the ring is protected by either one of the following theories grounded in the Uniform Commercial Code:
 1. His status of a bona fide purchaser for value. Code 1975, § 7-2-403 (1).
 2. His status of a buyer in the ordinary course of business. Code 1975, § 7-2-403 (2).
 3. His status of a secured creditor retaining collateral in satisfaction of an obligation. Code 1975, § 7-9-505 (2).
Thomasson has since dropped his theory of buyer in the ordinary course of business on this appeal, and now claims he is protected as a creditor of a consignee pursuant to Code 1975, §7-2-326 (2). Admitting he did not explicitly plead this defense, Thomasson argues that his pleadings and the evidence in this case raise the consignment issue under our current liberal rules of pleading, specifically Rule 15 (b), ARCP, allowing automatic amendment of pleadings to conform to the evidence.
Discovery consisted solely of the taking of depositions of the two principal parties. Documents pertaining to transactions involving the ring were obtained at the same time. The transcripts of the depositions were filed three weeks later. On the following day, the parties filed with the trial court their stipulation of facts which basically extrapolated and condensed the pertinent facts discovered via the depositions. The documents discovered were also made a part of the stipulation. We find the facts contained in the stipulation to be determinative of the issues at hand and find no need to refer to the depositions included in the record on appeal. Thus, for the purposes of our review, we will rely on the following relevant facts set out in part in the stipulation:
 4. In their dealings with Candido Martinez, until early April 1979 when they learned of each other's respective claimed interest in the diamond, both parties felt Martinez was an honest businessman and did not suspect any untruth in the representations which they say, respectively, Martinez made to them.
 5. Candido Martinez throughout the relevant time period was a diamond salesman or diamond broker and worked for the firm of DeBeers Diamond Investment, Ltd., Scottsdale, Arizona, during 1976, 1977 and until early 1978 when Martinez and one Ray Evans organized a diamond merchant or diamond trading company known as Intergem, Inc., of Scottsdale, Arizona (sometimes also represented as "International Gems, Incorporated").
 6. The diamond was acquired by David J. Bischoff from another diamond dealer, Amiton Company, of New York City on about February 19, 1977. Within thirty days of its acquisition from Amiton, Bischoff mailed the diamond to Martinez, who was then with DeBeers Diamond Investment, Ltd. in Arizona, with instructions for Martinez to broker or sell the same for Bischoff (with Martinez to receive a 10% commission on the sale). On or about April 11, 1977 DeBeers Diamond Investment, Ltd. returned the diamond to Bischoff accompanied by a letter (Exhibit B). In May or June of 1977, Bischoff mailed the diamond back to DeBeers, who held it until early 1978, under an arrangement whereby it was to be offered for sale for Bischoff's account by Martinez subject to Bischoff's approval of terms. In early 1978 when Bischoff was advised that Martinez had left the employ of DeBeers Diamond Investment, Ltd. and had organized Intergem, Inc., Bischoff caused DeBeers Diamond Investment, Ltd. to return the diamond to him. Two or three months later, in or about April 1978, Bischoff mailed the diamond to Martinez at Intergem, Inc., in Arizona under the same arrangement as mentioned above. Martinez subsequently *Page 362 
brought the diamond with him on a trip to Birmingham, Alabama when he met with Albert F. Thomasson, in June 1978, and then took the diamond back to Arizona with him when he left from the Birmingham meeting. On or about July 5, 1978 Martinez mailed the diamond by Federal Express and other precious stones from Arizona to Albert F. Thomasson, who picked up the package at the Birmingham Airport, and the diamond thereafter remained in the possession of Albert F. Thomasson between July 6, 1978 and the date this suit was filed as collateral for Thomasson's guarantee of Intergem's loan from BTNB and foreclosure thereof.
 The arrangement between Intergem and Martinez ("Borrowers") on the one hand, and Thomasson ("guarantor"), on the other hand, was as follows:
 (a) Birmingham Trust National Bank ("BTNB") would loan $35,000.00 to the Borrowers and the note would be signed by Intergem as a corporation and by Martinez individually,
 (b) In consideration of a pledge of collateral described below and a $5,000 fee, Thomasson would endorse the $35,000 BTNB note as guarantor.
 (c) The agreed collateral consisted of (i) 50 carats of sapphires, in one and two carat stones, and (ii) the diamond ring in question. The Borrowers, upon payment of one-half of the loan, could redeem either the sapphires or the ring, but not both.
 Upon payment of $18,000 on principal of the note on July 18, 1978, Borrowers requested, and Thomasson delivered, a release to Borrowers of physical possession of the sapphires, thereafter leaving a $17,000 principal balance due on the note and solely the diamond in Thomasson's possession as collateral. Martinez represented to Thomasson that the diamond was his (Martinez) personal possession orally and in the writing attached as Exhibit I. Bischoff had no knowledge of and had given no permission for the above pledge transaction and Thomasson had no knowledge of Bischoff's title.
. . . .
 9. During the rest of 1978 following Bischoff's delivery of the diamond to Martinez and Intergem on about April, 1978, Martinez from time to time told Bischoff on several occasions that Martinez was attempting to sell the diamond. Martinez verbally and in writing (see Exhibit G) in June, 1978 requested that Bischoff permit Martinez to pledge the diamond in order that Intergem obtain working capital through borrowings, in exchange for a fee in the neighborhood of ten percent. Bischoff stated that he would consider such an arrangement if (i) the diamond were stored in a bank vault in Arizona and not removed therefrom without his permission and (ii) the loan arrangement details were cleared with Bischoff in advance. No specific loan or pledge details were furnished to Bischoff and Bischoff states he did not know of, or consent to, removal of the diamond from Arizona. Bischoff did not ask Intergem, Martinez or any banker for, or obtain, any safe deposit or other receipt from any bank in 1978 or 1979 showing custody or location of the diamond. Bischoff did not become concerned about the location of the diamond until he had difficulty reaching Martinez at the end of 1978 and first part of 1979. After he made specific inquiries of Ray Evans, then president of Intergem, in early 1979 as to the whereabouts of the diamond, he learned for the first time that the diamond had been sent to Birmingham, Alabama as a pledge in connection with a $35,000 loan to Intergem from BTNB. He then called BTNB who informed him of Thomasson's guarantee and possession under pledge of the diamond. When Bischoff thereafter reached Martinez and confronted him by telephone with the above facts which Bischoff had just learned, Martinez claimed he was authorized in 1978 by Bischoff to make this pledge. Bischoff responded that he had never given such authority and Martinez then replied that they must have "misunderstood" each other. Bischoff has now filed suit in Wisconsin *Page 363 
against Martinez, Evans and Intergem for damages with respect to conversion or unauthorized use or taking of the diamond but to date has effected no recovery in such suit (the proceedings in which are at an early stage).
. . . .
On this appeal, the parties have thoroughly briefed and argued the several defenses raised by Thomasson to this detinue action. We find it unnecessary to address all of them since, as will be shown, Thomasson is the rightful owner of the ring due to his status as a secured creditor of a consignee (Martinez), Code 1975, § 7-2-326 (2), who has properly complied with Code 1975, § 7-9-505 (2) to retain the ring in satisfaction of Martinez's obligation to him.
I. Reviewability of Consignment Defense
Before discussing whether the arrangement between Bischoff and Martinez constituted a "sale or return" or consignment sale controlled by Code 1975, § 7-2-326, we must address the preliminary issue of whether the theory of consignment sale was properly raised below. Bischoff argues it is not before us, since Thomasson did not amend his pleadings to specifically raise the defense. We disagree. As provided in Rule 15 (b), ARCP:
 When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. [Emphasis added.]
This Court has found implied consent where an opposing party fails to object to the introduction of evidence raising the disputed issue. See McDuffie v. Hooper, 294 Ala. 293,315 So.2d 573 (1975); Rafield v. Johnson, 294 Ala. 235, 314 So.2d 695
(1975). As noted in the Committee Comments to Rule 15, ARCP, "Under the rule where evidence is introduced or an issue raised with the express consent of the other party, or withoutobjection from him, the pleadings `shall' be deemed amended toconform to such evidence [emphasis added]."
We find that evidence of a consignment sale, as defined by Code 1975, § 7-2-326 (3), was introduced in the stipulation of facts without objection from Bischoff, thereby automatically amending the pleadings to raise this defense. That statutory definition is as follows:
 Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return.
Code 1975, § 7-2-326 (3).
Evidence of all the elements of this definition is contained in the stipulation of facts. It is stipulated that the ring was delivered by Bischoff to Martinez by mail to be offered for sale. Paragraph 6, Stipulation of Facts. It is further stipulated to the effect that Martinez maintained a place of business at Scottsdale, Arizona, where he dealt in diamonds under a name other than Bischoff, i.e., Intergem, Inc. Paragraph 5, Stipulation of Facts. This fact is also evidenced by the stipulated exhibits, such as the letterhead of Intergem, Inc., and its financial statement listing gems as its inventory. Bischoff's argument that the diamond transactions or the pledge in this case must take place at the place of business, i.e., over the counter, is a strained construction of the statutory definition, unsupported by the case law and blind to business realities. See Vonins, Inc. v. Raff, 101 N.J. Super. 172, 243 A.2d 836 (1968).
Bischoff further argues that he made a sufficient objection to the injection of the consignment issue in his trial brief. We cannot agree. On the day the stipulation of facts was submitted to the trial *Page 364 
court, the court heard oral arguments from the parties, but rendered no final judgment at that time. As noted above, evidence of a consignment sale had already been introduced without objection. Trial briefs were then submitted by the parties. Thomasson's brief argued for the first time the law as it applies to consignment sales. In a reply brief, Bischoff objected to these arguments as being outside the scope of the pleadings, but went on to address their merits anyway. Thus, the trial court was submitted full argument on this issue. It was not until some five months later that the trial court entered its final decree on motion by both the parties. The trial court had delayed the decree to await the outcome of Bischoff's Wisconsin suit against Martinez. At no time during these five months did Bischoff seek a ruling from the trial court on the raising of the consignment issue in Thomasson's brief. Prior to requesting the trial court to render a final decision, Bischoff did not ask for the record to be reopened to put in additional evidence on this issue, nor did he request further arguments. Bischoff could have refused to join in any request for submission on the record or he could have filed a post-ruling motion to set aside the decree and reopen the record. But he took none of these steps. See McDuffie v.Hooper, 294 Ala. 293, 315 So.2d 573 (1975). Having joined in the request for submission on the record as it then stood and having failed to object to the stipulated evidence of a consignment sale, Bischoff is bound by the record and state of the proceedings at that time. He cannot now on this appeal, and for the first time, seek to exclude this defense from the case.
 II. Applicability of Code 1975, § 7-2-326, Consignment Sales
Finding that the consignment issue was properly before the trial court, and thus merits our review, we now address the applicability of Code 1975, § 7-2-326, to the facts of this case. As already noted, facts were stipulated which met the essential elements of the statutory definition of a consignment sale. Because of the confusion surrounding the nature of consignment sales under the UCC, we think it beneficial to explore the major arguments made by Bischoff against the applicability of § 7-2-326.
Initially, Bischoff claims his arrangement with Martinez was merely one of agency. He also argues that Martinez was nothing more than a broker. We note that, unlike consignees, brokers are generally not given possession of the item intended to be sold. 12 C.J.S. Brokers § 4 (1980). In any event, the elements of all these relationships are wrapped up in the notion of consignment sale. As a much quoted commentator on consignment sales has stated:
 The hallmark of the consignment . . . is the absence of an absolute obligation on the part of the consignee to pay for the goods. He is not obligated to pay for the goods because he is not a buyer, but only an agent. The title does not move to him or through him. The title moves from the principal-consignor to the purchaser. "A consignment of goods for sale does not pass the title at any time, nor does it contemplate that it should be passed. The very term implies an agency, and the title is in the consignor, the consignee being his agent." Starting at this doctrinal baseline, it has been relatively easy for courts to find no consignment where the dealer is permitted to act like something more than a mere agent. Thus, if the dealer is given the right to sell the goods at any price or under such terms as he sees fit, keeping as his profit all he receives over the invoice price, the courts are apt to find no consignment, even though a formal consignment agreement has been executed.
Hawkland, Consignment Selling Under the Uniform CommercialCode, 67 Commercial L.J. 146, 147 (1962) (footnotes omitted).
As Hawkland notes, agency is a crucial element of the consignment relationship. In effect, a consignment is a special kind of agency involving the delivery of goods to one, who may be a broker as in this case, for the purpose of finding a buyer. Ultimately, *Page 365 
the labeling of an arrangement as a consignment sale for purposes of the UCC will be determined by the statutory definition contained in Code 1975, § 7-2-326 (3). In this case, that definition has been met.
Bischoff's argument that there must be a contract of sale, or a contemplated one, in the traditional sense of commercial law, see Code 1975, § 7-2-106 (1), ignores the special agency nature of the consignment relationship. As Hawkland observed, "The title does not move to him [the consignee] or through him. The title moves from the principal [the consignor] to the purchaser." Hawkland, Consignment Selling Under the UniformCommercial Code, 67 Commercial L.J. 146, 147 (1962). This is not the traditional concept of a sales contract. A similar argument that there must be a contract for sale was rejected by the Supreme Judicial Court of Massachusetts, one of the first states to adopt the UCC, in General Electric Co. v. PettingellSupply Co., 347 Mass. 631, 199 N.E.2d 326, 328 (1964), viz.:
 The plaintiff contends that § 2-326 is applicable only to cases where the relationship between manufacturer and dealer is that of seller and buyer and that inasmuch as the contract in suit establishes only a principal-agent relationship between the plaintiff and Pettingell no part of § 2-326 is applicable.
 We disagree with the contention that § 2-326 (3) is inapplicable. That subsection is by its terms concerned with certain transactions which, although they may not be sales under the definition of G.L. c. 106, § 2-106 (1), are nonetheless "deemed to be on sale or return." "with respect to claims of creditors of the person conducting the business * * *."
. . . . .
 The plaintiff relies on the wording of the second sentence of § 2-326 (3) which states that the subsection applies even though there is a reservation of title "to the person making delivery until payment or resale" (emphasis supplied). From this the plaintiff argues that the subsection applies only where the manufacturer has sold the goods to the dealer because otherwise there could be no "resale." The second sentence gives examples of transactions to which the subsection applies and does not limit the plain meaning of the first sentence. The subsection is concerned with transactions "deemed" to be of "sale or return" and the first sentence is carefully drafted to apply to transactions which might not ordinarily be characterized as sales. [Emphasis added.]
See Harold Klein Co., Inc. v. Lopardo, 113 N.H. 400,308 A.2d 538 (1973); Baumgold Brothers, Inc. v. Allan M. Fox Company,East, 375 F. Supp. 807 (N.D. Ohio 1973).
Bischoff further argues that the only Alabama cases applying Code 1975, § 7-2-326 (3), found that there was a contract for sale in the traditional sense, citing Modular Housing, Inc. v.G.A.C. Trans-World Acceptance Corp., 288 Ala. 77, 257 So.2d 326
(1972); Blowers v. First National Bank of Huntsville,45 Ala. App. 485, 232 So.2d 666 (1970). This is a misreading of those cases. In Blowers, the Court of Civil Appeals specifically held:
 The evidence as contained in the record before this court was amply sufficient to warrant the trial judge in finding that an oral contract existed between Doyle Brady Auto Sales, Inc. [consignee] and National Car Rentals [consignor] for the possession and disposition of the four vehicles in question, and that the vehicles were on Brady's auto lot for sale, and in line for sale.
45 Ala. App. at 492, 232 So.2d 666 (emphasis added).
There is nothing in this language to indicate a finding of a contract for sale. Quite the contrary, the court upheld a finding of an oral contract for the possession and disposition
of the consigned goods. The court reached its conclusion after weighing conflicting evidence on the nature of the agreement and examining in detail the history of dealings between the parties. Two kinds of arrangements were employed by the parties in the past — an outright sale and a consignment arrangement outlined in the following testimony summarized by the court: *Page 366 
 Mr. Tatum [manager for N.C.R.] on the other hand testified that Brady had sold some twenty-five to fifty motor vehicles for National Car Rentals in the capacity of a commission agent.
 . . . . Mr. Tatum testified that when the automobiles were on consignment to Brady, that National Car Rentals still had title and right to possession of them, and if Doyle Brady obtained a purchaser for them, he would pay National Car Rentals for the motor vehicles after they were sold.
 Mr. Tatum also stated that in a few instances, title to the motor vehicles would be given directly to the ultimate purchaser by National Car Rentals. In some instances National Car Rentals would turn over the motor vehicle and the keys thereto to Mr. Brady. There were also times when the bill of sale would be made out to the ultimate purchaser, but given to Mr. Brady to be handed to the purchaser. Furthermore, the tag receipts to the motor vehicles were usually transferred directly to the purchaser, although in a few instances they were given to Mr. Brady.
45 Ala. App. at 487-88, 232 So.2d 666.
It is clear that the court did not rely on the evidence of an outright sale; such is not the basis of a finding of a "sale or return" within the definition of Code 1975, § 7-2-326. Rather, the court's affirmance of a consignment sale finding can only be based on the testimony of Mr. Tatum regarding an agency relationship without a contract for sale, similar in many respects to the instant case. Similarly, there is nothing in the brief opinion of Modular Housing, Inc., to indicate that the court based its finding of a Code 1975, § 7-2-326 (3), consignment on the existence of a contract for sale. In fact, the nature of the agreement between the consignor and consignee was not even explored by this Court in that case.
Finally, Bischoff relies on two cases, which he claims are directly on point, to take the instant fact situation out of the scope of Code 1975, § 7-2-326. Allgeier v. Campisi,117 Ga. App. 105, 159 S.E.2d 458 (1968); Founders Investment Corp.v. Fegett (not officially reported), 23 UCC Rep. 903 (Ky.Ct.App. 1978). In Allgeier, the Georgia court held:
 Where, as in the present case, an individual owner of an automobile delivers it to an automobile dealer for the purpose of having said dealer secure offers for the purchase thereof, and to sell the same upon approval of an offer by the individual owner, the automobile dealer to receive a commission of a set sum regardless of the sale price, such transaction is not a "sale or return" transaction between a buyer and a seller within the meaning of the Georgia Uniform Commercial Code § 109A-2-326, so as to make said automobile subject to levy and sale upon executions obtained against the automobile dealer by creditors of the dealer.
117 Ga. App. at 105, 159 S.E.2d 458.
Finding a fact situation similar to that of Allgeier, the Kentucky court denied the applicability of U.C.C. § 2-326, stating, "At most, we glean that Griffee intended to create a limited bailment or sales agency in Fegett. Fegett has no power to sell the trailer in question. All he could do was receive and transmit offers to Griffee." 23 UCC Rep. at 905. Adopting the rule of Allgeier, the Kentucky court reasoned:
 We believe it would be an unjust and unwise policy to impose upon an individual owner, as distinguished from a commercial one, the deemed sale or return provision of KRS 355.2-326 (3) unless the underlying facts indicate that a sale or return was intended or did, in fact, occur. Our decision does no disservice to the utilization of the Uniform Commercial Code between commercial dealers. It does reserve protection to the private individual owner vis-a-vis the commercial financier when such owner merely attempts, as in this case, to utilize the marketing or sales services of a commercial dealer with no intention of transferring any ownership interest to such dealer. Because transactions of the type in question are relatively few we do not think *Page 367 
that commercial dealers or financiers will suffer unduly, but we do believe that the individual owner, to whom the loss in a given situation would be relatively more severe, will be afforded fair and reasonable protection.
23 UCC Rep. at 906.
We cannot agree with the reasoning of these two maverick cases. Code 1975, § 7-2-326, makes no distinction between commercial and individual owners who consign their goods. As stated in Code 1975, § 7-2-102, "Unless the context otherwiserequires, this article [Article 2] applies to transactions in goods. . . ." The instant case involves such a transaction in goods and meets all the other requirements of Code 1975, §7-2-326. If the drafters of the consignment provision had intended to limit its scope to commercial consignors, they could have inserted a limiting phrase such as "between merchants." This has been utilized throughout Article 2 of the UCC. See, e.g., Code 1975, §§ 7-2-201 (2), -205, -207 (2), and -209 (2). Yet, it is noticeably absent in the consignment provision.
No doubt the Georgia and Kentucky courts operated on sympathy for the individual consumer who lost his car or mobile home. While we do not feel that the comprehensive statutory scheme of the UCC should be eroded by an ad hoc balancing of the equities, we note the instant case does not invoke the same sympathy given sway in Allgeier and Fegett. Bischoff is no inexperienced consumer seeking to sell his personal car or mobile home. Rather, he has bought a diamond strictly for investment purposes, hoping to sell at a profit. An individual playing the diamond market deserves no special consideration from the courts.
The Fegett case also relies on a finding that the parties only "intended to create a limited bailment or sales agency. . . ." 23 UCC Rep. at 905. The intention of the parties is not the determinative factor for the applicability of Code 1975, §7-2-326. Cf. Bukfor, Inc. v. Star Jewelry Co., Inc.,552 S.W.2d 522 (Tex.Civ.App. 1977). (Finding a consignment sale under U.C.C. § 2-326 (3), the Texas court noted, "The intention of the parties is no longer determinative of the question of whether a transaction is a sale or consignment.") The test is simply one of looking at the outwardly visible aspects of the transaction outlined in Code 1975, § 7-2-326 (3), viz.: (1) delivery of possession to the consignee, (2) engaging in the business of selling such types of items by the consignee, and (3) failure of the consignor to give public notice of his retained interest in the goods. This objective test was followed by this Court in Modular Housing, Inc., which held: "In view of Section 2-326 (3) of the Uniform Commercial Code and the Blowers case, and the fact that appellant is merelyrelying on an undisclosed oral agreement between it andLefever, we are constrained to affirm the action of the trial court." 288 Ala. at 80, 257 So.2d 326 (emphasis added).
As stated by the Wisconsin Supreme Court in ColumbiaInternational Corp. v. Kempler, 46 Wis.2d 550, 175 N.W.2d 465,469 (1970), the purpose of U.C.C. § 2-326 is to permit people "to deal with a debtor upon the assumption that all property in his possession is unencumbered, unless the contrary is indicated by their own knowledge or by public records." The policy of the UCC would be undermined if an owner such as Bischoff could show by proof of undisclosed mental operations that the transaction was something other than a consignment. We simply cannot accept the rationale of Fegett. We agree with the sound criticism of Fegett voiced by the editors Willier Hart in 6 (c) Bender's Uniform Commercial Code Reporter — Digest, Case, A-41, p. 281 (Supp. June 1980), viz.:
 It is a narrow reading of Section 2-326 (3) to say that the owner did not deliver the mobile home to the dealer "for sale", but the court emphasized the owner's discretion regarding the offers to conclude that the owner intended at most only a limited bailment or sales agency. Section 2-326 (3) is not based on intent but rather objective circumstances to characterize a delivery as on sale or return with respect to the dealer's creditors. *Page 368 The court also emphasized the owner's retention of title which is irrelevant under Section 2-326 (3). Apparently the court here was more concerned with the harshness of allowing consignors to be subjected to a provision which it feels should be restricted to transactions between commercial parties. [Emphasis added].
Bischoff makes numerous additional arguments that Code 1975, § 7-2-326, is not applicable to the instant case. We find it unnecessary to address these as we find no merit or substantial support for these arguments.
Finding that the transaction between Bischoff and Martinez constituted a "sale or return" within the objective test provided in Code 1975, § 7-2-326 (3), thereby subjecting the ring to the claims of Martinez's creditors, we now consider whether Bischoff is protected by any of the three exceptions to the rule contained within the provision, viz.:
 However, this subsection is not applicable if the person making delivery:
 (a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or
 (b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or
 (c) Complies with the filing provisions of the article on secured transactions (article 9).
Code 1975, § 7-2-326 (3).
There is no "sign law" in this state available to Bischoff to protect himself. The only other affirmative action he could have taken to protect his interest was to file a financing statement. It is undisputed that he did not avail himself of this simple procedure. Nevertheless, Bischoff claims he has proved that Martinez is generally known by his creditors to be substantially engaged in selling the goods of others. We disagree. Bischoff argues that the stipulation that Martinez was a broker, one who by definition deals in goods of others, was sufficient proof. This is a flimsy inference indeed. What two individuals, Bischoff and Thomasson, consider Martinez to be is no indication of how Martinez is generally viewed by his creditors. See Sussen Rubber Co. v. Hertz, 19 Ohio App.2d 1,249 N.E.2d 65 (1969). The most that can be drawn from the stipulation is that Martinez substantially engaged in selling the goods of others. This alone does not support the conclusion that Martinez is "generally known by his creditors" to be doing so. See American National Bank v. Tina Marie Homes, Inc.,28 Colo. App. 477, 476 P.2d 573 (1970).
III. Remedies Under Code 1975, 7-9-505 (2)
It is undisputed that Thomasson properly complied with the provisions of Code 1975, § 7-9-505 (2), viz.:
 In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor and except in the case of consumer goods to any other secured party who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or is known by the secured party in possession to have a security interest in it. If the debtor or other person entitled to receive notification objects in writing within 30 days from the receipt of the notification or if any other secured party objects in writing within 30 days after the secured party obtains possession the secured party must dispose of the collateral under section 7-9-504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation. [Emphasis added.]
It is further undisputed that Bischoff did not object in writing within 30 days of his receipt of the notification from Thomasson. Cf. Waldrep v. Jochum, 337 So.2d 334 (Ala. 1976) (proper written objection given). We *Page 369 
note that, under the circumstances of this case, Bischoff was a proper object of a written notice "to the debtor" to effect the remedy of retaining the collateral. See Code 1975, §§ 7-9-105 (1)(d) and -112 (b). Thus, Thomasson claims he is entitled to possession of the ring on the strength of this provision alone. We agree with Bischoff that this is merely bootstrapping. As pointed out by Bischoff, this remedy is only available to asecured party who attains that status via the requirements of Code 1975, § 7-9-204 (1), viz.: "A security interest cannot attach until there is agreement (subsection (3) of section7-1-201) that it attach and value is given and the debtor hasrights in the collateral. [Emphasis added.]" Thomasson has tried to bootstrap himself around the prerequisite that the debtor (Martinez) have "rights in the collateral" (the ring). Nevertheless, we have established that Martinez did indeed have "rights in the collateral" by virtue of his status as a Code 1975, § 7-2-326, consignee whose goods are subject to the claims of his creditors. This use of U.C.C. § 2-326 to supply the necessary "rights in collateral" has been adopted by other jurisdictions. See General Electric Credit Corp. v. Town Country Mobile Homes, 117 Ariz. 562, 574 P.2d 50 (1977); NascoEquipment Co. v. Mason, 291 N.C. 145, 229 S.E.2d 278 (1976);James Talcott, Inc. v. Franklin National Bank of Minneapolis,292 Minn. 277, 194 N.W.2d 775 (1972); Sussen Rubber Co. v.Hertz, 19 Ohio App.2d 1, 249 N.E.2d 65 (1969). In both ModularHousing, Inc., and Blowers, a perfected secured creditor was given priority over the consignor of goods, implicitly recognizing that the consignee had rights in the collateral for the secured party's interest to attach. As noted in J. White 
R. Summers, Handbook of the Law Under the Uniform CommercialCode, § 23-4, at 795 (1972):
 If the debtor acquires goods from a third party merely on consignment, he may, under appropriate circumstances, pass a security interest in the goods to his creditor that will cut off the interest of the consignor. That is, a debtor may acquire "rights in the collateral" where the collateral consists merely of consigned goods. [Footnote omitted.]
Finding that Thomasson properly gave notice to Bischoff of his intent to retain the ring and Bischoff failed to object in writing pursuant to Code 1975, § 7-9-505 (2), we hold that Thomasson is entitled to retain possession of the ring. The judgment of the trial court, which failed to establish the priority of the interests of these parties in the ring, is due to be reversed and remanded. The trial court is to enter a judgment in favor of Thomasson on his counterclaim for title to the ring.
REVERSED AND REMANDED WITH DIRECTIONS.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, SHORES, EMBRY and BEATTY, JJ., concur.
ALMON, J., not sitting.