BRADLEY, Judge.
Plaintiffs sought to recover certain funds allegedly owed them by defendant under the Medicaid Program. The trial court denied them relief and they appeal.
Each of the three plaintiffs is a nursing home provider and an Alabama corporation. They are also part of a larger corporate entity, Max-I-Care Centers, Inc., which owns at least eight nursing homes in Alabama. Each plaintiff is what is known as a “provider” of nursing home services to Medicaid patients. A “provider,” in Medicaid terminology, is an entity, such as a nursing home or hospital, or an individual, such as a doctor, who provides services under contract with the State Medicaid Agency (Alamed), for which the provider is reimbursed. For each of the four years now in dispute, 1978, 1979, 1980, and 1981, the plaintiffs entered into provider contracts with Alamed. The plaintiffs had no other relationship with Alamed than their contractual relationship.
Under the Medicaid Program, payments are made to the provider by Alamed for services rendered to Medicaid patients and the money for such payments comes from state and federal sources. Such payments are to be made as provided in a plan which conforms to the Federal Social Security Act and which has been approved by the Secretary of the United States Department of Health and Human Services. 42 U.S.C. section 1396a(a)(13)(E), requires that such plans provide for reimbursement to the providers “on a reasonable .cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost finding methods approved and verified by the Secretary.”
Such a plan was adopted by Alamed and approved by the Secretary. The plan provided for reimbursement to the nursing homes by the following method:
“(1) All nursing home providers were grouped into categories;
“(2) ALAMED then took the projected cost per day (derived from the June fiscal year cost reports from each nursing home);
“(3) ALAMED then placed each home in a class from the lowest projected cost home to the highest;
“(4) ALAMED then multiplied the number of providers in the particular class by 60%. For example, if there were 200 homes in a class, ALAMED would multiply 200 X .60. As a result, the nursing home in the 120th position (200 X .60) would have its projected rate selected as the maximum ceiling' which would be paid to all nursing homes in that class the following year. Thus, the following year, a nursing home would be paid its actual projected cost per day or the ceiling, whichever was less;
*560 “(5) If the nursing home’s actual rate exceeded its previous year’s projected rate there was a ‘positive variance.’ Thus, the nursing home’s overage would be added to next year’s projected rate. Likewise, if the nursing home’s actual rate was less than the previous year's projected rate such overages paid by ALAMED would be subtracted from the home’s projected rate for the following year.”
Plaintiffs contend that the sixtieth percentile method operated to limit their ability in the following year to recover those amounts which they were underpaid in the prior year. As a result, Luverne Geriatric Center claims it delivered services to patients under the Medicaid program in 1978 at a reasonable cost of $105,964 in excess of the projected rate. Lakeview Manor, Inc. likewise contends it delivered such services in 1978 at a reasonable cost of $24,-393 in excess of the projected rate. Valley Brook Park, Inc. claims it delivered such services in 1979 at a reasonable cost of $3,546 in excess of the projected rate, and that it did likewise in 1980 at a reasonable cost of $3,403 in excess of the projected rate.
Plaintiffs further contend that the refusal by defendant to pay them the full reasonable costs of rendering services to Medicaid patients violated 42 U.S.C. section 1396a (a)(13)(E) and 42 C.F.R. section 447.-302, which provides:
“(a) Methods and standards for determining payment rates must reasonably take into account actual costs of the allowable items set forth in §§ 447.
“(b) Payment rates must not be set lower than rates that the agency reasonably finds to be adequate to reimburse in full the actual allowable costs of a facility that is economically and efficiently operated.” (Emphasis added.)
In order to comply with federal laws and regulations, Alamed must pay providers “according to the methods and standards set forth in the plan [the State Plan] under § 447.301,” which sets out three criteria the state’s reimbursement methodology must meet in order to establish “reasonable cost-related payment rates”:
“(1) The plan must set forth the methods and the standards used by the agency to set reasonable cost-related rates;
“(2) The methods and standards must be developed by the agency on the basis of cost-finding methods approved under § 447.276.
“(3) The agency must set payment rates on the basis of the methods and standards. The payment rates must be effective no later than January 1, 1978.”
As revealed by the evidence, Alamed met all three of the above requirements, as well as those requirements set out in section 447.276:
“(1) The plan must specify the cost finding method or methods to be used by providers;
“(2) There must be a uniform method for all S.N.F.s and a uniform method for all I.C.Fs.
“(3) The cost-finding method must be approved by the Regional Medicaid Director.”
The trial court found that “in order for ALAMED’s reimbursement methodology to be declared valid ALAMED need only show the Secretary of Health and Human Services approved and verified its plan.” Additionally, the trial court stated that “the Secretary did approve and verify ALAMED’s plan.” We agree. Furthermore, the United States District Court for the Middle District of Alabama, in Alabama Nursing Home Ass’n v. Schweiker, No. 77-52-N (M.D.Ala. Feb. 19, 1982), held that Alamed’s reimbursement methodology was not illegal. Hence, all three nursing homes received sufficient reimbursement in accordance with the federal requirements.
Moreover, the parties stipulated at trial that their relationship was purely contractual. The pertinent parts of their contracts are as follows:
“3. Provider agrees to furnish medically necessary skilled or intermediate care services to eligible beneficiaries in the Medicaid Program in accordance with *561 the provisions of the State Plan for Medical Assistance (hereinafter referred to as the ‘State Plan’) for the State of Alabama, as approved by the Secretary, Department of Health, Education and Welfare, and as the said State Plan may bé amended from time to time.
“4. The Medicaid rate will be established on the basis of a per diem based on an audit report of operating expenses submitted to MSA. The rate will reflect the principles of reimbursement under Title XVIII (Medicare) of the Social Security Act adapted for such items as might be necessary to conform to the State Plan under Title XIX (medicaid). Medicaid payments will not exceed Medicare reasonable costs....
“5. The Provider further agrees:
“a. That payment under the Medicaid Program will be accepted as payment in full for services covered under the Medicaid Program, and that no subsequent charge will be made to the patient or sponsor for such covered services.”
The trial court held that the plaintiffs were estopped to deny the terms of their agreement or to assert that their agreement was other than its terms provided. The trial court said that the parties’ agreements were clear and unambiguous and that the plaintiffs were bound by their terms. We agree.
“A party who proposes the terms of a contract or assents to them is estopped, generally speaking, to impeach the stipulations which he suggested or by means of which he procured the making of the contract, provided no fraud or imposition has been practiced upon him. Furthermore, where a party has executed or accepted a written contract, he is es-topped to deny its terms or to assert that the actual agreement made was otherwise than as stated.” (Footnotes omitted.)
17 Am.Jur.2d Contracts § 9. Moreover, this court has recognized the doctrine of estoppel where parties have contractually agreed to certain terms. Pardue v. Citizens Bank & Trust Co., 287 Ala. 50, 247 So.2d 368 (1971).
Additionally, plaintiffs contend that because appellee did not initially include estoppel as an affirmative defense in her answer or her amended answer she is precluded from arguing it. We disagree.
Rule 8(c) of the Alabama Rules of Civil Procedure requires the affirmative defense of estoppel to be affirmatively pleaded. Rule 8(c) must be read in conjunction with A.R.Civ.P. 15(b), however, which provides for the automatic amendment of pleadings to allow them to conform to the evidence that has already been presented to the court. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they have been raised in the pleadings. Alabama courts have recognized rule 15(b) as an exception to the rule that an affirmative defense was waived if not specifically pleaded. Robinson v. Morse, 352 So.2d 1355 (Ala.1977); 6 C. Wright & A. Miller, Federal Practice and Procedure § 1493 (1971).
Likewise, in a case similar to ours, the Alabama Supreme Court said that:
“As noted in the Committee Comments to Rule 15, ARCP, ‘Under the rule where evidence is introduced or an issue raised with the express consent of the other party, or without objection from him, the pleadings “shall” be deemed amended to conform to such evidence.’ ’’(Emphasis omitted.)
Bischoffv. Thomasson, 400 So.2d 359 (Ala. 1981). The Bischoff case was a detinue action regarding the ownership of a platinum ring, and the parties filed with the trial court a stipulation of facts. In his answer the defendant raised several affirmative defenses, but did not specifically raise as a defense the theory that he was protected under the Uniform Commercial Code as a creditor of a consignee. The court found that the evidence of the consignment was introduced in the stipulation of facts without objection from the plaintiff, thereby automatically amending the pleadings to raise the defense.
*562 Similarly, in the present case, evidence supporting estoppel was introduced to the court before the plaintiffs objected. The contracts were introduced without objection by the plaintiffs on November 8, 1981. Moreover, evidence regarding the contractual relationship was introduced with approval by plaintiffs in the joint stipulations (specifically Stipulation 8), which were filed with the court on January 18, 1983. Based upon Bischoff, supra, and the joint stipulations involved in this case, the trial court did not err in considering both the evidence and testimony on the issue of the provider contracts and their effect on plaintiffs’ suit.
The judgment of the trial court is affirmed.
AFFIRMED.
WRIGHT, P.J., and HOLMES, J., concur.