L. CHARLES WRIGHT, Retired Appellate Judge.
James Young is a dealer in coins and precious metals in Tennessee and operates a business called Jim’s Coin Service. Southern Metallic Enterprises, Inc. (SME), was located in Birmingham and engaged in the primary business of refining precious metals. AmSouth Bank (AmSouth) was the holder of a perfected security interest in the inventory and accounts receivable of SME, including after-acquired property.
On September 9, 1981, Young delivered some gold-filled material to SME to be refined. SME delivered receipt #1241 to Young as evidence that the gold-filled material was received. SME did a preliminary melt of this gold-filled material and sent it to Johnson Matthey (JM), an international precious metal refinery located in Canada, for further refining.
SME went out of business in October 1981. Sometime around October 1, 1981, AmSouth began foreclosure of its security agreement with SME. AmSouth notified JM of a claimed security interest in the property of SME on October 1, 1981. On April 23, 1982, AmSouth instructed JM to sell any of SME’s property in its possession and remit the proceeds to AmSouth. JM followed those instructions. The proceeds from the sale were remitted to AmSouth and applied to SME’s obligation to Am-South.
On October 22, 1981, Young picked up the residue of metals from the preliminary melt from SME and received invoice # 100819, which indicated that Young received the residue from the preliminary melt and that the gold had been shipped to JM for further refining. The reverse side of invoice # 100819 contained the additional provisions which stated that the materials were furnished and accepted “on consignment,” with SME assuming only the responsibility of a bailee.
Young testified that he attempted to retrieve his gold as soon as he discovered that it had been shipped to JM and that AmSouth had foreclosed on SME.
Young instituted this action against Am-South to recover the proceeds from the sale of gold held by JM. He contends that, *836 because the scrap gold was delivered to SME only to be refined with title retained, it was not subject to AmSouth’s security interest.
AmSouth’s answer set forth several defenses, including the affirmative allegation that Young had failed to comply with the provisions of the Uniform Commercial Code (UCC) in protecting his consignment relationship with SME. After a hearing, the trial court entered judgment for Young in the amount of $8,410.45. AmSouth appeals.
AmSouth contends that the transaction between Young and SME was a consignment for sale under § 7-2-326, Ala. Code 1975 (UCC), and because Young failed to comply with the provisions of the UCC, he cannot prevail over AmSouth, a perfected secured creditor. Young contends that the UCC does not apply and that the trial court’s judgment should be affirmed.
The dispositive issue is whether the trial court erred when it failed to apply to the facts of the case the provisions of § 7-2-326(3), Ala.Code 1975 (UCC).
The trial court found that the refining of precious metals was the primary business of SME. The evidence supports that finding. Our review of the record reveals that Barry Tripp, who was vice president of SME in charge of all engineering operations, testified that SME refined precious metal and that SME was a refiner of, rather than a dealer in, silver and gold. Tripp also testified that, while SME would refine and sell some gold and silver, primarily to industrial users, it only charged a set refining fee based on the number of ounces refined and did not charge a commission for selling it.
Young testified that he had previously dealt with SME and on such occasions SME would refine the gold or silver and return it to him. He stated that he had never requested that SME sell any gold or silver for him and that he did not make such a request in September 1981 because he already had a purchaser for that gold.
The trial court’s order states, in pertinent part:
“There is dispute and ambiguity from the evidence whether the scrap materials were sent to SME by the plaintiff on consignment, or merely for SME to perform the services of refining the gold for a fee and then return the refined product to the plaintiff.
“The court is reasonably satisfied from the evidence that title to the scrap metal and its refined gold content, remained in the plaintiff. The plaintiff’s property never became a part of inventory nor accounts receivable of SME on which the defendant had perfected security interest.”
In cases where the evidence was presented ore tenus, the findings of the trial court are accorded a presumption of correctness, and such findings will not be disturbed on review unless so unsupported by the evidence as to be clearly erroneous or manifestly unjust. Leslie v. Pine Crest Homes, Inc., 388 So.2d 178 (Ala.1980); Gibson v. Nix, 460 So.2d 1346 (Ala.Civ.App.1984). This presumption of correctness is strengthened when, as in this case, the trial court denies a motion for a new trial. Gibson, 460 So.2d 1346.
At the time of the transfer of the unrefined gold, there is no evidence that the transaction between Young and SME was anything more than a bailment or entrustment of goods. Receipt # 1241, dated September 9, 1981, merely indicates receipt of scrap materials described by type and weight. The evidence indicates that there was an agreement that SME was to refine the gold. The logo of SME on the receipt states its business to be the “reclaiming and refining of silver and precious metals.” Subsequently, SME did a preliminary melt, transferred the gold to JM for further refining, and returned the residue to Young. If, as AmSouth argues, the gold-filled material received by SME on September 9, 1981, became subject to AmSouth’s lien, the residue would appear to also have been subject to that lien. However, the residue was returned to Young on October 22, 1981, along with invoice # 100819. That invoice, issued after foreclosure by Am-South, is the instrument which AmSouth contends shows a consignment for sale under § 7-2-326(3) of the Alabama UCC.
From our review of the record, we find that the evidence supports the trial *837 court’s finding that the transaction was only for the purpose of refining the gold and the delivery of the gold to SME was only for that purpose and not a consignment for sale.
It is AmSouth’s primary contention that § 7-2-326(3), Ala.Code 1975, is applicable in the present case. This section provides, as pertinent:
“(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as ‘on consignment’ or ‘on memorandum.’ ”
AmSouth argues that no evidence was presented by Young that he objected to the terms contained on the reverse side of SME invoice # 100819. AmSouth contends that the terms of invoice # 100819 establish the agreement of the parties, control the transaction, and make the transaction subject to § 7-2-326 as a consignment for sale.
The invoice provides in pertinent part: “1. Southern Metallic Enterprises, Inc., hereinafter known as the ‘Company,’ has received the materials described on the reverse side hereof, hereinafter referred to as ‘Material’ from the ‘Customer’ furnishing said material. It is agreed by and between the ‘Company’ and the ‘Customer’ that said materials are furnished and accepted on consignment and the terms, conditions and obligations regarding the ‘Material’ and the ‘Company’s’ responsibilities with reference thereto are only as hereinafter set out.
“2. The ‘Company’ is accepting and receiving the ‘material’ on consignment and has only those responsibilities and obligations as that of a bailee.” (Emphasis added.)
If we accepted as fact the contention of AmSouth that SME was a consignee of Young, there would be no problem to this case. However, the trial court, after viewing the instrument claimed to establish a consignment and hearing oral testimony as to the relationship and agreement of the parties, found the evidence to establish “dispute and ambiguity.” The court then found from the evidence that there was no consignment for sale under § 7-2-326(3). We find the evidence to support the court’s finding. When there exist dispute in the evidence and ambiguity in the instrument relied on, the matter becomes one for the trier of fact. Huggins v. Hanover Insurance Co., 423 So.2d 147 (Ala.1982); Miles College, Inc. v. Oliver, 382 So.2d 510 (Ala.1980); Johnson-Rast & Hays, Inc. v. Cole, 294 Ala. 32, 310 So.2d 885 (1975).
AmSouth has relied substantially upon the Alabama cases of Blowers v. First National Bank, 45 Ala.App. 485, 232 So.2d 666 (Ala.Civ.App.1970), and Bischoff v. Thomasson, 400 So.2d 359 (Ala.1981), especially Bischoff. We have studied those decisions and find them easily distinguishable from the facts of this case. In fact, we have researched numerous cases in other jurisdictions and have failed to find § 7-2-326(3) of the various uniform laws applied to facts such as those in this case.
It is evident from every case that, in order to apply § 7-2-326(3), the threshold requirement is that there must be a delivery of goods to a “person for sale.” There was such a delivery, in both Blowers and Bischoff. It was made plain in each that, in accord with the further words of § 7-2-326(3), if there was such a delivery, even with retention of title to the goods by the deliverer, use of words in the agreement such as “on consignment” or “on memorandum” is of no avail. Section 7-2-326(3) applies. It was determined factually in each of those cases that there was a consignment for sale. In the official comment to § 7-2-326, it is stated: “This section nevertheless pre-supposes that a contract for sale is contemplated by the parties although that contract may be of the peculiar character here described.” The Supreme Court in Bischoff discusses the peculiar character of the contract contemplated by § 7-2-326(3).
There are no facts present in this case which indicate in any way that Young and *838 SME contemplated a relationship of seller-buyer or that of special agency involving delivery of goods to one for the purpose of finding a buyer, as described by Hawkland, Consignment Selling Under the Uniform Commercial Code, 67 Commercial L.J. 146, 147 (1962). The closest factual setting to this case that we found is In re Sitkin Smelting & Refining, Inc., 639 F.2d 1213 (5th Cir.1981). In that case, the court, speaking of § 7-2-326, Ala.Code 1975, said:
“The type of sale or return contemplated in section 2-326 is a consignment, where a buyer ‘purchases’ goods with the understanding that the seller will accept their return in lieu of payment if they fail to be resold.”
In re Sitkin Smelting & Refining, Inc., 639 F.2d 1213, 1218. We repeat that there appears no such transaction in this case.
Young has contended that the transaction here was simply a bailment. Such may be the case, as a bailment is defined as the “delivery of personal property under agreement that the same property be restored to the person delivering it in the same or altered form.” Blair v. United States, 164 F.2d 115, 116 (5th Cir.1947). That definition appears to apply to the facts of this case; however, we deem it unnecessary to make such a determination. We have found the trial court to have correctly determined that the transaction was not a sale or return under § 7-2-326. What sort of commercial transaction it was in fact is not relevant to this opinion. The judgment of the trial court is affirmed.
The foregoing opinion was prepared by Retired Appellate Judge L. CHARLES WRIGHT while serving on active duty status as a judge of this court under the provisions of § 12-18~10(e), Code 1975, and is hereby adopted as that of the court.
AFFIRMED.
BRADLEY, P.J., and INGRAM, J., concur.
HOLMES, J., recuses himself.