STORM, INC., Petitioner,

v.

INDIANA DEPARTMENT OF STATE REVENUE, Respondent.

No. 49T10–9403–TA–00112.

Tax Court of Indiana.

March 29, 1996.

Martha B. Wentworth, Joseph R. Impicciche, Hall, Render, Killian, Heath & Lyman, P.C., Indianapolis, for Petitioner.

Pamela Carter, Attorney General, Marilyn S. Meighen, Deputy Attorney General, Indianapolis, for Respondent.

FISHER, Judge.

Storm, Inc. (Storm) appeals a final determination of the Indiana Department of State Revenue (the Department) assessing Storm special fuel taxes for the years 1985, 1986, 1987, and 1988 (the years at issue).

### ISSUES

I. Whether Storm is liable for special fuel taxes imposed by the Department for the years at issue.

II. Whether the doctrine of laches should bar the Department from collecting any special fuel taxes that Storm may owe.

### FACTS

#### A. Storm's Relationship to the Gas Stations

This case arises out of a fairly complicated set of facts. It involves two different gasoline service stations, one in New Washington, Indiana, the other in Hanover, Indiana (collectively referred to as "the stations" and

individually referred to as the "New Washington Station" and the "Hanover Station") and one special fuel dealer,[1] Storm.

During the years at issue, the stations underwent a number of changes: the names of the stations changed, the owners of the stations changed, the operators of the stations changed, and the suppliers of special fuel to the stations changed. For purposes of this case, these changes and reasons therefore are not important. What is important is Storm's relationship with each station and the fact that, at various times during the years at issue, Storm served as the owner, operator, and/or supplier of special fuel to one or both stations. Storm's relationship with each station is summarized in the chart below.

### The New Washington Station

| Date | Owner | Operator | Supplier |
| --- | --- | --- | --- |
| January & February, 1985 | **Storm** | **Storm** | **Storm** |
| March 1985 – December 1987 | Wiggam | Wiggam | **Storm** |
| 1988 | Osborne | Osborne | **Storm** |

### The Hanover Station

| Date | Owner | Operator | Supplier |
| --- | --- | --- | --- |
| January – July, 1985 | Imogene Storm | Burke | **Storm** |
| * * * * | | | |
| July 27, 1986 – August 31, 1987 | Imogene Storm | **Storm** | Kiel Bros. |

---

#### B. Storm as Fuel Supplier

During the period of time that Storm supplied special fuel to the stations, it did so under oral metered marketing arrangements (MMAs). An MMA is an arrangement between a fuel supplier and a station under which the fuel supplier delivers fuel to the station and is paid for the fuel as it passes through a metered pump,[2] rather than when it is delivered to the station. MMAs are common among fuel suppliers and small, "Mom and Pop" type stations that typically do not have enough resources on hand to pay for fuel before it is sold.

Under the specific terms of Storm's MMAs, Storm delivered special fuel into certain bulk tanks located at the stations. Fuel was then dispensed from those bulk tanks to the stations' customers via a metered pump At periodic intervals, the station operators took readings of their meters and remitted payment to Storm for the amount of fuel that passed through the meter.

Storm retained ownership of the special fuel while it was stored within the bulk tanks. Consequently, if any special fuel evaporated or leaked out of the bulk tanks without passing through the meter in the metered pump, Storm bore the loss. If, however, special fuel was lost after it passed through the meter in the metered pump, the station operators bore the loss. Thus, the station operators could become liable to Storm for the purchase price of special fuel, even if the fuel was not sold.

#### C. Storm as Station Operator

During the period of time that Storm operated the Hanover Station, it purchased special fuel from Kiel Brothers. It did not,

---

1. A "special fuel dealer" is a "person who sells and delivers, or sells and causes to be delivered, special fuel or alternative fuel in Indiana." IND. CODE 6–6–2.1–103(h) (repealed by P.L. 277–1993(ss), SEC. 56).

2. A metered pump that measures and records the amount of fuel that is dispensed from it.

however, have an MMA with Kiel Brothers. Instead, Kiel Brothers presented Storm with a bill for the fuel at the time the fuel was delivered. Storm paid the bill seven or eight days later.

### PROCEDURAL HISTORY

In the spring of 1988, the Department audited Storm for the years at issue. The audit revealed that Storm did not remit special fuel taxes to the Department on special fuel sold at the stations during the periods outlined in the chart above. Consequently, the Department assessed Storm special fuel taxes in the amount of $32,417.51 plus penalties and interest.

Storm objected to the assessment. It requested an administrative hearing in order to formally present its objections. A hearing was held on September 18, 1989.

A few months later, the hearing officer drafted an internal memorandum recommending that Storm be found not liable for the taxes at issue. In accord with standard Departmental procedure, the hearing officer forwarded his memorandum to the Department's audit division and instructed the audit division to conduct a supplemental audit. The purpose of the supplemental audit was to allow the audit division to reexamine the original assessment and make it conform to the hearing officer's memorandum. The audit division completed its supplemental audit on January 2, 1991.

After the supplemental audit was completed, a Letter of Findings dated February 5, 1991, was drafted informing Storm that it was not liable for the special fuel taxes at issue. That letter, however, was never mailed to Storm, for supervisors in the audit division disagreed with it.

The audit division supervisors themselves then conducted a further investigation of Storm. Thereafter, they determined that Storm was liable for the taxes at issue and instructed that a new Letter of Findings be drafted reflecting their decision. No such letter, however, was drafted until April 7, 1993. Storm received the April 7, 1993, Letter of Findings on April 14, 1993. Consequently, approximately 3 years and 7 months passed between the date of Storm's administrative hearing and the date that Storm received the Department's final determination.

After Storm received the April 7, 1993, Letter of Findings, it requested a rehearing with the Department. The Department denied Storm's request for a rehearing on January 14, 1994. Storm filed this original tax appeal on March 18, 1994. Additional facts will be supplied as necessary.

### STANDARD OF REVIEW

■ This court reviews appeals from the Department *de novo*. *Mechanics Laundry & Supply v. Indiana Dep't of State Revenue*, 650 N.E.2d 1223, 1227 (Ind.Tax 1995). It is not bound by the issues or the evidence presented at the administrative level. *Id.*

### DISCUSSION & ANALYSIS

#### I

Indiana imposes a tax on: 1) "the placing of special fuel into the taxable storage facility of an authorized unlicensed user or an authorized unlicensed special fuel dealer," and 2) "the use of special fuel," which is defined as "the delivery or placing of special fuel into the supply tank of a motor vehicle in Indiana." I.C. 6–6–2.1–201; I.C. 6–6–2.1–103(i). This tax is known as "the special fuel tax." *See* I.C. 6–6–2.1–101.[3]

Because Storm did not enter into any written agreements under I.C. 6–6–2.1–505,[4]

---

**3.** Most of the sections contained within I.C. 6.6–2.1, including I.C. 6–6–2.1–201, I.C. 6–6–2.1–103, and I.C. 6–6–2.1–101, were repealed by P.L. 277–1993(ss). See now, generally, I.C. 6–6–2.5.

**4.** I.C. 6–6–2.1–505 provides:
(a) Notwithstanding the other provisions of this chapter, a special fuel user may pay the tax imposed by this chapter to his supplier if:
  (1) the supplier is a licensed special fuel dealer; and

(2) the special fuel user, supplier, and administrator (the Department) enter into a written agreement authorizing payment of the tax in that manner.
(b) A special fuel dealer may pay the tax imposed by this chapter to the dealer's supplier if:
  (1) the supplier is a licensed special fuel dealer;

Storm did not "plac[e] … special fuel into the taxable storage facility of an authorized unlicensed user [5] or an authorized unlicensed special fuel dealer." [6]  Consequently, the only issue to be decided is whether Storm "deliver[ed] or plac[ed] … special fuel into the supply tank of a motor vehicle in Indiana" during any of the time periods at issue.

### A. Taxes Imposed on Special Fuel Sold at the New Washington Station in January and February, 1985

■ Storm owned, operated, and supplied special fuel to the New Washington Station during the months of January and February, 1985.  Accordingly, there is no question that Storm delivered or placed special fuel into the supply tanks of motor vehicles in Indiana during those months.  In fact, but for Storm's laches argument, which the court will address later, Storm would concede that it is liable for the taxes imposed during those months.  *Petitioner's Post–Trial Brief* at 4–5, n. 2.

### B. Taxes Imposed on Special Fuel Sold at the New Washington Station During the Period March 1985 through December 1988 and Taxes Imposed on Special Fuel Sold at the Hanover Station During the Period January 1985 through July 1985.

The Department argues that Storm is liable for special fuel taxes imposed on special fuel sold at the New Washington Station during the period March 1985 through December 1988 and the Hanover Station during the period January 1985 through July 1985 under either of two theories.  First, the Department contends that Storm is liable for the taxes because Storm owned the special fuel at the time it was sold to the station operators' customers.  In the alternative, the Department contends that Storm is liable for the taxes because Storm had a consignment

arrangement with the station operators for the sale of special fuel.

#### 1.  Ownership of the Fuel

■ Although Storm owned the special fuel while it was stored within the bulk tanks, ownership of the special fuel passed from Storm to the station operators before it was ultimately sold to the station operators' customers.  Specifically, ownership of the special fuel passed from Storm to the station operators at the instant the special fuel flowed through the meter in the metered pump.  Consequently, the station operators, not Storm, owned the special fuel at issue when it was delivered or placed into the fuel supply tanks of motor vehicles in Indiana.  As a result, Storm is not liable for the special fuel taxes at issue under the Department's theory of ownership.

#### 2.  Consignment

■ A consignment arrangement is an arrangement involving the delivery of goods to another for the purpose of finding a buyer.  *Bischoff v. Thomasson,* 400 So.2d 359, 364 (Ala.1981).  In a consignment arrangement, title to or ownership of consigned goods does not move to or pass through the consignee.  *Id.; see Welsh v. Kelly–Springfield Tire Co.,* 213 Ind. 188, 197, 12 N.E.2d 254, 258 (1938).  Rather, title to or ownership of consigned goods moves or passes directly from the consignor to the buyer.  *Bischoff,* 400 So.2d at 364.

■ As explained above, ownership of the special fuel passed from Storm to the station operators before it was ultimately placed into the supply tanks of motor vehicles in Indiana.  This fact is inconsistent with a consignment arrangement and, consequently, establishes that there was not a consignment

---

(2) the special fuel dealer has no more than two (2) taxable special fuel pumps at any one (1) location; and

(3) the special fuel dealer, supplier, and administrator enter into a written agreement authorizing payment of the tax in that manner.

I.C. 6–6–2.1–505 was repealed by P.L. 277–1993(ss), SEC. 57.  See now, generally, I.C. 6–6–2.5.

5.  An "authorized unlicensed user" is a special fuel user who enters into a written agreement under I.C. 6–6–2.1–505(a) with his supplier and the Department to pay the special fuel tax to his supplier.  I.C. 6–6–2.1–103(k).

6.  An "authorized unlicensed special fuel dealer" is a special fuel dealer who enters into a written agreement under I.C. 6–6–2.1–505(b) with his supplier and the Department to pay the special fuel tax to his supplier.  I.C. 6–6–2.1–103(m).

arrangement between Storm and the station operators. Storm is not liable for the special fuel taxes under the Department's theory of consignment.

D. Taxes Imposed on the Special Fuel Sold at the Hanover Station During the Period July 27, 1986 through August 31, 1987

■ Storm acknowledges that it delivered or placed special fuel into the supply tanks of motor vehicles in Indiana when it operated the Hanover Station from July 27, 1986 through August 31, 1987. *Petitioner's Post–Trial Brief* at 4, n. 2. Accordingly, Storm concedes that it was liable for the special fuel taxes imposed on that fuel. *Petitioner's Post–Trial Brief* at 4, n. 2. Storm maintains, however, that it is no longer liable for those taxes because it has already paid them.

To prove that it has already paid the taxes, Storm presented testimony explaining that because it did not have a special fuel dealer's license for the Hanover Station, it made "arrangements" to pay the special fuel tax to Kiel Brothers and for Kiel Brothers to remit the tax to the Department on its behalf. *Trial Transcript* at 24. Storm presented further testimony explaining that Kiel Brothers included the special fuel tax in the price per gallon it charged Storm. *Trial Transcript* at 24, 47. Finally, Storm presented receipts documenting its purchases of special fuel from Kiel Brothers. *Petitioner's Exhibit 30.* This evidence, Storm concludes, proves that it has satisfied its special fuel tax liability.

The court disagrees. The receipts do not show that Storm paid the special fuel tax to Kiel Brothers because the receipts do not itemize the amount paid for special fuel and the amount allegedly paid in taxes. They show only a total dollar amount paid.

Moreover, I.C. 6–6–2.1–201, I.C. 6–6–2.1–103(h), and I.C. 6–6–2.1–505(b) establish that, in the absence of a written agreement under I.C. 6–6–2.1–505(b), special fuel dealers (i.e. station operators) are liable to the Department for special fuel taxes on the special fuel that they deliver or place into the fuel supply tanks of motor vehicles in Indiana. The apparent purpose of the law is to conclusively establish who (as between station operators and their suppliers) is liable for the special fuel tax in order to avoid confusion about who must pay.

Here, Storm had no written agreement with Kiel Brothers and the Department under I.C. 6–6–2.1–505(b) establishing that Kiel Brothers would pay special fuel taxes to the Department on Storm's behalf. Further, there is no evidence that Kiel Brothers actually paid special fuel taxes to the Department on Storm's behalf. In the absence of a written agreement under I.C. 6–6–2.1–505(b) or proof that Kiel Brothers has actually paid special fuel taxes on Storm's behalf, Storm remains liable to the Department for the taxes imposed. Thus, Storm is liable for the taxes imposed on special fuel sold at the Hanover Station during the period July 27, 1986 through August 31, 1987.

## II

Having determined that Storm is liable for the taxes imposed on special fuel sold at the New Washington Station during the months of January and February, 1985 and at the Hanover Station during the period July 27, 1986 through August 31, 1987, the court must now decide whether the doctrine of laches should bar the Department from collecting those taxes.

■ "Laches" is an equitable defense which may be raised to stop a person from asserting a claim that he would normally be entitled to assert. *See Haas v. Holder,* 218 Ind. 263, 32 N.E.2d 590 (1941). The rationale behind the doctrine of laches is that a person who, for an unreasonable length of time, has neglected to assert a claim against another waives the right to assert his claim when his delay prejudices the person against whom he would assert it. *Id.* Before a court will bar a claim due to laches, it must find the presence of three elements: 1) inexcusable delay in asserting a right, 2) an implied waiver arising from knowing acquiescence in existing conditions, and 3) circumstances resulting in prejudice to the adverse party. *Matter of Geisler,* 614 N.E.2d 939, 940 (Ind.1993).

█ Storm argues that the doctrine of laches is applicable in this case because: 1) the Department allowed nearly four years to pass between the date of its administrative hearing and the date that it finally issued its Letter of Findings, 2) the Department's delay was unreasonable, and 3) the Department's delay prejudiced Storm's ability to present its case to this court and increased the amount of interest that Storm might now be forced to pay. The court disagrees.

As noted above, before a court will bar a case due to laches, it must first find inexcusable delay in asserting a right. Here, the Department did not delay in *asserting* its right to collect special fuel taxes from Storm. Indeed, the Department completed its special fuel tax audit of Storm on or about April 4, 1989, and issued its proposed assessment approximately 21 days later on April 25, 1989. *Petitioner's Exhibit 10; see Petitioner's Exhibit 11.* The Department's delay was in *resolving* Storm's protest (i.e. arriving at a final determination and issuing Storm a Letter of Findings). While the court does not condone the Department's delay in resolving Storm's protest, laches involves delay in bringing a case, not delay in resolving a case.[7] The Department is not barred by the doctrine of laches from collecting the special fuel taxes that Storm owes.

## CONCLUSION

For the reasons stated above, the court holds that Storm is liable for special fuel taxes, interest thereon, and any previously assessed penalties imposed on special fuel sold at the New Washington Station during the period January and February, 1985 and special fuel sold at the Hanover Station during the period July 27, 1986 through August 31, 1987.

---

**7.** Because Storm has not satisfied the first element of laches, there is no need for the court to address the remaining two elements of laches.