[No. 46198. En Banc. March 20, 1980.]

YAKIMA CEMENT PRODUCTS COMPANY, *Respondent,* v.
GREAT AMERICAN INSURANCE COMPANY,
*Petitioner.*

*Nashem, Prediletto, Schussler & Halpin* and *Don W. Schussler,* for petitioner.

*Halverson, Applegate & McDonald* and *Walter G. Meyer, Jr.,* for respondent.

*David F. Hiscock* on behalf of Washington Association of Defense Counsel, amicus curiae.

STAFFORD, J.—Yakima Cement Products Company sued its insurer, Great American Insurance Company, to recover a portion of damages Yakima was required to pay F. S. Jones Construction Company for the negligent and defective manufacture of concrete wall panels. Both Yakima and Great American sought review of the trial court's decision. Great American has petitioned for review of the Court of Appeals opinion. We reverse the Court of Appeals and affirm the result reached by the trial court.

Yakima contracted with Jones to manufacture and deliver 81 precast concrete panels to serve as the exterior walls of two buildings Jones was constructing for the Army Corps of Engineers. The panels were to be erected by a Jones subcontractor. After 63 panels had been manufactured, delivered, and incorporated into the Army's operations building, it was discovered that 38 had been manufactured in a negligent and defective manner. They

were not uniform in size, they varied in thickness, the exterior exposed aggregate did not conform to specifications and several window openings were inaccurate both in size and location. Until the panels had been erected, however, Yakima, Jones and the Army were not aware they had been misfabricated. The Army rejected them for failure to meet the requisite architectural specifications. Correction of the defects required Yakima to remove, refabricate and reerect numerous panels while others were repaired in place. This remedial work was done at Yakima's own expense and is not a part of the claim for damages herein. All corrections were made well after the Yakima–Jones contract contemplated completion, thereby causing a material delay of the entire construction project.

These events gave rise to a dispute between Yakima and Jones. Jones refused to pay, claiming the damages incurred exceeded the original contract price. Yakima sued in federal court to recover on the contract and Jones counterclaimed for its claimed damages. Yakima tendered defense of the Jones counterclaim to Great American which declined, asserting its comprehensive liability insurance policy did not cover the incident. Thereafter, Yakima and Jones resolved their dispute and memorialized the settlement in findings of fact, conclusions of law and judgments entered in federal court in favor of both Yakima and Jones. Based on Jones' counterclaim, Yakima's claim against Jones was reduced by $26,000 for the damages outlined in finding 9(a) below, and by $43,474.17 for those expenses incident to delay outlined in finding 9(b) below, for a total of $69,474.17. Thereafter, Yakima filed this action against Great American to recover the $69,474.17 judgment entered against it on the Jones counterclaim.

■ In the instant case the trial court determined, in unchallenged finding of fact No. 9, that as a result of the delay and inability to use the panels to support the remaining structure in the building, numerous damages were sustained by Jones, including the following:

(a). Damages incurred by Jones to the roof materials, beams, steel joists and other structural steel *which was to be used* to form the roof and supporting structure for the building, *which became exposed to natural elements and as a result thereof, was damaged,* resulting in expense to cure said damages as a result of sandblasting and painting the structure and otherwise, in the amount of $26,000.00.

(b). Other costs and expenses incurred by Jones due to increased costs incurred by its subcontractors and by it directly due to the delays in the construction project, including increased rental charges, increased cost of labor, increased cost of materials, and increased cost of testing, all in the amount of $43,474.17.

(Italics ours.) Since error has not been assigned to the foregoing findings, we must accept them as verities. *Portage Bay–Roanoke Park Community Council v. Shorelines Hearings Bd.,* 92 Wn.2d 1, 6–7, 593 P.2d 151 (1979); *Lakeside Pump & Equip., Inc. v. Austin Constr. Co.,* 89 Wn.2d 839, 576 P.2d 392 (1978).

The comprehensive liability insurance policy issued to Yakima by Great American obligates the insurer:

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of property damage caused by an occurrence.

The trial court held that the negligent and defective manufacture of the concrete panels was unexpected and unintended thereby constituting an "accident" and thus an "occurrence" within the terms of the policy. The trial court held further that the damage set forth in finding 9(a) (*i.e.,* $26,000.00) was "property damage" and would be covered by the policy but for the fact that such damage arose from "loss of use" of the product thus falling within the terms of the policy's exclusionary clause (n) which provides:

(n) under Coverages B and D, to damages claimed for the withdrawal, inspection, repair, replacement, or *loss of use* of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use

because of any known or suspected defect or deficiency therein.

(Italics ours.) Additionally, the trial court determined the expenses incident to delay set forth in finding 9(b) (*i.e.,* $43,474.17) did not constitute "property damage", as defined in the policy, and thus were not covered.

Yakima appealed asserting it was entitled to coverage under the policy because the expenses incident to delay set forth in finding 9(b) were "property damage" within the terms of the insurance contract. Further, Yakima asserted that exclusion (n) was not applicable. Great American cross-appealed asserting there was no "accident" and thus no "occurrence" giving rise to liability under the policy. Great American also contended there was no "property damage" within the policy's definition and that exclusion (n) precluded recovery.

The Court of Appeals affirmed the trial court's rulings that there was an "occurrence" within the terms of the policy and opined that what the trial court characterized as "roof" damage amounted to "property damage". In reversing the trial court, however, it concluded that the expenses incident to delay were also "property damage" thus giving rise to liability under the policy. The Court of Appeals also concluded that exclusionary clause (n) did not preclude liability because no actual claim was made for the product's withdrawal or loss of use.

## Occurrence

Initially we must determine whether Yakima's negligent and defective manufacture of the concrete panels, which necessitated the removal, repair and reerection of a number of panels and the in-place repair of others, was an "occurrence" within the terms of the policy. An "occurrence" is defined by the policy as:

[A]n *accident* including injurious exposure to conditions, which results, during the policy period, in . . . property damage neither expected nor intended from the standpoint of the insured. . . .

(Italics ours.) A threshold question is the meaning of "accident" which is not defined in the policy. Great American argues that the present facts do not evidence an "accident" because the misfabrication of the concrete panels was the direct result of Yakima's volitional and intentional acts. Amicus curiae argues that the term accident refers only to an "active malfunctioning" of the insured's product and that no such malfunctioning occurred here. We reject both contentions.

Great American has improperly focused on the volitional and intentional nature of Yakima's manufacturing operation which produced the defective concrete panels. The insurer cites *Evans v. Metropolitan Life Ins. Co.*, 26 Wn.2d 594, 174 P.2d 961 (1946) for the proposition that an accident does not exist when a deliberate act is performed, unless some additional unexpected, independent, and unforeseen happening occurs which produces or brings about the result of injury or death. *Evans,* however, is inapposite. In *Evans* we construed the term "accidental" within the context of an accidental death policy. We deal here with an accident within the context of a products liability policy. In the area of products liability, if insurance coverage does not extend to the deliberate manufacture of a product which inadvertently is mismanufactured, and thereafter results in property damage, the coverage would be rendered virtually meaningless. *Bundy Tubing Co. v. Royal Indem. Co.,* 298 F.2d 151, 153 (6th Cir. 1962).

The appropriate definition of "accident", as a source and cause of damage to property, is "an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause". *Hauenstein v. St. Paul-Mercury Indem. Co.,* 242 Minn. 354, 358–59, 65 N.W.2d 122 (1954). *See also Viking Automatic Sprinkler Co. v. Pacific Indem. Co.,* 19 Wn.2d 294, 297, 142 P.2d 394 (1943); 7 A.L.R.3d 1262 (1966). Applying this definition, it is clear Yakima's unintentional and unexpected mismanufacture of the concrete panels is an "accident" as contemplated by the Great American policy.

We note further that the word "accident" is but part of the definition of the broader term "occurrence". As noted in *Aerial Agricultural Serv. of Montana, Inc. v. Till,* 207 F. Supp. 50, 57–58 (N.D. Miss. 1962):

> To begin with, the word "occurrence", to the lay mind, as well as to the judicial mind, has a meaning much broader than the word "accident". As these words are generally understood, accident means something that must have come about or happened in a certain way, while occurrence means something that happened or came about in any way. Thus *accident* is a special type of *occurrence,* but occurrence goes beyond such special confines and, while including accident, it encompasses many other situations as well.
>
> . . .
>
> It would, therefore, seem that from the usual and ordinary meaning of the words used the word "occurrence" extends to events included within the term "accident" and also to such conditions, not caused by accident, which may produce an injury not purposely or deliberately.

*See* Hall, *Contractors' Liability Insurance for Property Damage Incidental to Normal Operations—The Standard Coverage Problem,* 16 U. Kan. L. Rev. 181, 203 (1968); Keeton, *Insurance Law* § 5.4(c), at 300 (1971). Accordingly, use of the word "occurrence" in the policy is further support for our conclusion that the negligent mismanufacture of the concrete panels, which necessitated their removal, refabrication, repair and reerection falls within the policy's coverage.

We also decline to limit the words "accident" and "occurrence" to include only damage arising from the "active malfunctioning" of the insured's product such as the breaking of a defective panel with resultant injury to a person or damage to property by its fall. An accident has been found where defective doors were installed in buildings (*Geddes & Smith, Inc. v. St. Paul–Mercury Indem. Co.,* 51 Cal. 2d 558, 334 P.2d 881 (1959)); where the plant-

ing of the wrong type of seed resulted in a reduction in the following season's yield (*St. Paul Fire & Marine Ins. Co. v. Northern Grain Co.,* 365 F.2d 361 (8th Cir. 1966)); and where the insured failed to properly complete an automatic sprinkler system which, had it been operational, would have prevented a subsequent fire in the building (*Viking Automatic Sprinkler Co. v. Pacific Indem. Co., supra*). In each case a finding that an accident had occurred did not turn on the "active malfunctioning" of the insured's product. Rather, it turned on the failure of the product to perform the function for which it was sold or manufactured. The term "accident" must be defined in the context of the product being manufactured by the insured and the kind of losses sustained in the event of a defect in manufacture. As noted in *Ramco, Inc. v. Pacific Ins. Co.,* 249 Ore. 666, 673, 439 P.2d 1002 (1968): "the hazards to be insured against are the mishaps or unintended consequence that can result from the use of the product." Clearly, the mismanufacture of the panels and their subsequent incorporation into the operations building constituted the use of a product which failed to perform the function for which it was manufactured.

We conclude Yakima's negligent and defective manufacture of the concrete panels, necessitating their removal, refabrication, and repair constitutes an "accident" and thus an "occurrence" within the terms of the policy.

## PROPERTY DAMAGE

As noted previously, the policy covers damages arising out of "property damage caused by an occurrence". The policy defines property damage as "injury to or destruction of tangible property." The Court of Appeals concluded there was property damage within the terms of the policy for two reasons: first, the value of the building was diminished by incorporation of the defective panels; and second, there was tangible damage to the "roof" caused by its

exposure to the elements.[1] Having come to the conclusion there was injury to tangible property (*i.e.,* the "roof") the Court of Appeals found that the expenses incident to construction delay ($43,474.17) flowed therefrom and thus were recoverable as *consequential* damages. We reverse the Court of Appeals and hold that none of the damages claimed by Yakima constitute property damage caused by an "occurrence".

█ Initially we address the Court of Appeals conclusion that property damage occurred when the defective concrete panels were incorporated into the operations building. The Court of Appeals has relied on a series of decisions which hold that the very presence of a defective product in an otherwise sound structure is property damage within the terms of products liability insurance. *Hauenstein v. St. Paul–Mercury Indem. Co., supra; St. Paul Fire & Marine Ins. Co. v. Northern Grain Co., supra; Geddes & Smith, Inc. v. St. Paul–Mercury Indem. Co., supra; but see Hamilton Die Cast, Inc. v. United States Fidelity & Guar. Co.,* 508 F.2d 417 (7th Cir. 1975). Those decisions, however, are distinguishable from the present case because the instant record is devoid of evidence that the value of the operations building was diminished by the integration of the defective panels. Further, the trial court neither made findings of fact to that effect, nor was the failure to do so assigned as error by Yakima. Yakima's claims arise out of the damages suffered by Jones and the Army, yet neither claimed damages on any diminution in the building's value. We must conclude, on the record before us, that no property damage to the operations building occurred at the time the defective concrete panels were incorporated into the operations building.

---

[1]There is neither a finding of fact nor a refused finding to support the Court of Appeals conclusion that there was tangible damage to the "roof" of the operations building. The importance of this unwarranted assumption will be discussed more fully later in the text.

■ As to the expenses incident to the delay in construction, Yakima asserts they arose as a consequence of damage to the operations building. We have previously held that similar policy language, *i.e.,* "injury to . . . tangible property", does not prevent intangible injury resulting in consequential damages. The policy does not require *tangible damage* to tangible property. *Labberton v. General Cas. Co.,* 53 Wn.2d 180, 332 P.2d 250 (1958); *General Ins. Co. of America v. Gauger,* 13 Wn. App. 928, 538 P.2d 563 (1975). However, consequential damages arising from intangible injury may be awarded only when they result directly from injury to or destruction of tangible property. *General Ins. Co. of America v. Gauger, supra.* Having concluded from the record before us that no *property* damage occurred when the defective concrete panels were incorporated into the operations building, Yakima's contention that the expenses incident to the construction delay are recoverable as consequential damages must fall (*i.e.,* there can be no recovery for the $43,474.17 set forth in finding 9(b)).

■ Turning to the $26,000 damages to the roof material, beams, steel joists and other structural steel (hereinafter referred to collectively as roof material), we note that such roof material was to be used later to form the roof and supporting structure for the building *after installation* of the concrete panels. We conclude the damage thereto does not constitute property damage *caused by* an "occurrence" as required by the insurance policy. The following facts regarding the damage to the roof material are evident from the findings of fact, the trial court's memorandum opinion (*V.C. Edwards Contracting Co. v. Port of Tacoma,* 83 Wn.2d 7, 514 P.2d 1381 (1973)) and the record as a whole. Prior to incorporating the defective concrete panels into the operations building, only the steel lattice designed to support the roof material was in place. Thereafter, the entire construction project was delayed until Yakima's concrete panels could be removed, refabricated, and replaced. Because work on the building could not proceed, the roof material remained on the ground and was stored on the

jobsite several months longer than intended. While the roof material was piled on the ground, exposure to the elements caused it to weather and rust. It is clear the property damage was not caused by the mismanufacture or even by the installation, removal, repair and refabrication of the concrete panels. It resulted from delay in construction of the operations building. While we do not interpret the policy as limiting recovery to physical damage which may occur to other tangible property from *contact* with the goods or products of the insured, we do conclude that the term "caused by" requires at least some direct and substantial relation between the occurrence and the ensuing property damage. Tinker, *Comprehensive General Liability Insurance—Perspective Overview,* 25 Fed'n Ins. Counsel Q., 217, 259 (1975). It is evident that the relation between the mismanufactured concrete panels and the damage to the roof material is wholly tangential.

The record not only fully supports the foregoing conclusions concerning damage to the roof materials, but uncontested finding of fact No. 9(a) refers in part to: Damages incurred by Jones to the roof materials, beams, steel joists and other structural steel which *was to be used* to form the roof and supporting structure for the building . . ." (Italics ours.) In support of the foregoing finding, William B. Douglas, owner and vice–president of Yakima testified:

Q. What part did the panels play in the buildings? What were they to do? What part of the building did they form?
A. They formed the walls of the building.
Q. Did they have anything to do with the roof structure?
A. Well . . . they had to be completed and approved before the roof structure could be completed.

. . .

Q. At the time that you delivered the panels to the job site, and after they were actually erected . . . what stage of completion was the building in?
A. Well, they had done work on the floors, and basically, and some maybe of the outside work, and then basically our walls were up, and then that was about it, and the next step in the process was to put the roof

on so they could go to work on the rest of the inside . . .

Q. Were some of the structural steel members already up on the roof?

A. Some of the posts in the middle of the building and some of the lattice work was up. It couldn't be completed until it was tied into our wall structure.

Q. . . . Is there lattice that supports the roof?

A. Yeah. There was some steel lattice that . . . was up and would then get the covering of the roof pieces.

Q. And what happened to that, those posts and lattice? . . .

A. It was stored on the job site.

Q. What happened to that lattice and posts and roof structure stored on the job site?

A. Well, that was one of the—I think that was one of the damages—the $26,000 they were talking about—but basically if we had of performed like we were supposed to and we had it up there like we were in early December, the walls would have been up, and Jones' plan was to get that covered before the winter set in, and as it turned out we finally completed the marble-creting, I think, towards the end of April, so this, all these materials sat through the winter, and there was a considerable amount of rust, and the Corps says, "Sorry, but you are going to have to sandblast and reprime and repaint it."

Q. Was it done?

A. Yes it was.

Q. Those roof materials, these structural materials about which you have testified, when were they delivered to the job site? . . .

A. . . . I am almost positive I remember seeing the pile . . . sometime in December . . . and they probably were there in October . . .

Q. The delay which was to occur as a result of the refabrication was fully recognized by everyone involved, not only you, but Jones and everybody else—the Corps of Engineers—you all talked about . . . the fact that there would be some delay because of the refabrication?

A. It was pretty obvious.

Q. And the structural roof materials, were they covered or protected in any way?

A. Well, some of them were up, and those, you know, that was a great big building, so it was impossible to cover all the pieces that were up. There were some laying on the ground. Like I say, I think they were the members that were going to go over the top, and as, I think they tried to cover them, but, you know how the wind and rain, and it was—I don't think they got the job done. I don't know whether they could have or not.

Q. The damage which occurred to those roof structure materials occurred entirely, I gather, from what you say is because of exposure to the elements?

A. (Nods head) That's all I knew about. Whether there were some other damages because they were lying out there a long, for four, five months and somebody ran into them and this type of thing, I don't know about that, but I know that—

Q. The only damage you know of occurred just because of the passage of time?

A. Yes.

Q. The fact that they could not be incorporated into the building, awaiting your refabrication?

A. (Nods head)

Q. Is that right?

A. (Nods head)

Furthermore, we take note of federal court finding of fact No. 22(a) which, although not binding on the parties to the instant action, was drafted by Yakima and provides further indicia of its own characterization of the events in the present proceeding:

[22(a)] Jones had ordered certain materials to be placed into the operations building including the roof, steel joists and steel posts and beams to support the same. These materials *were to be incorporated* into the operations building after the walls (pre–cast panels) were erected. Because the pre–cast concrete panels manufactured by Yakima Cement were defective and said defects had to be cured, said roof materials, beams, steel joists, and other structural steel was materially damaged because of its exposure to natural elements. As a result thereof, said damage had to be cured and corrected by F.

S. Jones at its expense in the amount of $26,000.00 before it could be incorporated into said building.

(Italics ours.)

In summary, we hold Yakima's negligent and defective ·manufacture of the concrete panels constitutes an "occurrence" within the terms of the policy. Since we also hold that the damage to the roof materials and expenses incident to delay do not constitute "property damage caused by an occurrence", there is no coverage for Yakima's claims. Having concluded there is no coverage, we need not address the remainder of Great American's contentions.

■ The Court of Appeals is reversed. The result reached by the trial court is affirmed, but on the grounds set forth above. Where a judgment is correct, it will not be reversed because the trial court gave an incorrect reason for its rendition. *Kirkpatrick v. Department of Labor & Indus.,* 48 Wn.2d 51, 290 P.2d 979 (1955).

UTTER, C.J., and ROSELLINI, WRIGHT, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.

Reconsideration denied May 20, 1980.