493 So.2d 1337 (1985)
FITNESS EQUIPMENT COMPANY, INC.
v.
PENNSYLVANIA GENERAL INSURANCE COMPANY.
SCOTT AIR, INC.
v.
PENNSYLVANIA GENERAL INSURANCE COMPANY.
83-1251, 83-1310.
Supreme Court of Alabama.
September 27, 1985.
As Corrected on Denial of Rehearing July 18, 1986.
*1338 Lyman H. Harris and R. Stan Morris of Harris, Evans & Downs, and Ollie L. Blan, Jr. of Spain, Gillon, Riley, Tate & Etheredge, Birmingham, for appellants.
James H. Starnes and E. Martin Bloom of Starnes & Atchison, Birmingham, for appellee.
ADAMS, Justice.
These appeals are from a declaratory judgment entered against Fitness Equipment Company, Inc. (FEC) in the Circuit Court of Jefferson County. In its declaratory judgment order, the court decreed that Pennsylvania General Insurance Company (Penn. General) was not obligated to defend its insured, Scott Air, Inc., in an action filed against Scott Air by FEC, and was not obligated to pay any judgment obtained by FEC in its suit against Scott Air.
The facts of this case are as follows:
FEC is a small, new Alabama company which manufactures exercise treadmills. On January 5, 1982, FEC entered into a contract with Owl Biomedical, a national distributor of sporting equipment, wherein Owl Biomedical agreed to purchase 200 treadmills from FEC by the end of April 1982, and 100 treadmills per month for the remainder of 1982. The total yearly purchase would bring a $686,200.00 gross profit for FEC. The second year, Owl Biomedical was to purchase 2,400 treadmills at a total cost of $1.2 million. One of the advantages of FEC's contract with Owl Biomedical was the opportunity to place its product with a national distributor, thus eliminating sales, marketing, and advertising expenses so important to the growth of a new company.
An integral part of FEC's treadmills was an electric motor manufactured by Scott Air, Inc. After the first group of treadmills was sent out, FEC began receiving complaints that the machines were rattling and emitting smoke. FEC notified Scott Air of the problems, and some of the defective motors were shipped back to Scott Air for replacement. The treadmills continued to malfunction, even after the faulty motors had been replaced. FEC informed Scott Air that if the problems with these motors could not be eliminated, FEC would have to find another supplier of motors, as it was already in jeopardy of losing its contract with Owl Biomedical. Scott Air assured FEC that it had taken affirmative measures, and that the problems would be rectified. However, the motors continued to malfunction, and as a result, Owl Biomedical lost faith in FEC and cancelled the contract.
As a result of Owl Biomedical's cancellation of its contract with FEC, FEC filed suit against Scott Air, seeking $6 million damages on the theories of negligent design, negligent manufacture, negligent repair, misrepresentation, and breach of express and implied warranties. Scott Air, being a foreign corporation, filed a petition for removal to the United States District Court, which was granted, and the case was set for trial. Scott Air then made a demand upon its insurer, Pennsylvania General Insurance Company (Penn. General), to defend it in the suit.
While the action was pending in federal court, Penn. General filed a declaratory judgment action against Scott Air in the Circuit Court of Jefferson County, alleging that there was no coverage afforded Scott Air under the terms of the policy. Before the circuit court entered its final judgment, a consent judgment was reached between FEC and Scott Air in the United States District Court, wherein the parties agreed that Scott Air owed FEC $350,000.00. Scott Air was to pay $53,000.00 of the judgment to FEC, and assign to FEC its *1339 rights under the contract of insurance with Penn. General. Approximately two months later, the circuit court entered its judgment in favor of Penn. General, and FEC and Scott Air subsequently appealed.
FEC raises eight issues for our review; however, most of these issues deal with the court's interpretation of specific sections of the insurance policy issued by Penn. General to Scott Air. Thus, the dispositive issue on appeal is whether the trial court erred when it found that, according to the terms of the policy, Penn. General was not obligated to pay the consent judgment reached in the federal court action. For the reasons that follow, we are of the opinion that the court did so err, and, therefore, that its judgment is due to be reversed.
The following excerpt is taken from the trial court's final judgment, wherein it set forth the portions of the insurance policy which are relevant to the facts of this case:
SPECIAL MULTI-PERIL POLICY LIABILITY INSURANCE
1. The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
bodily injury or property damage
to which this insurance applies, caused by an occurrence, and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
This insurance does not apply:
(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;
....
(n) to property damage to the named insured's products arising out of such products or any part of such products;
....
(p) to damages cliamed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.
An "occurrence" is defined by the policy to mean "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
"Property damage" is defined to mean "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."
Secondly, there was an endorsement to the above coverage for contract liability which reads as follows:
CONTRACTUAL LIABILITY COVERAGE
(A) The definition of incidental contract is extended to include any contract *1340 or agreement relating to the conduct of the named insured's business.
(B) The insurance afforded with respect to liability assumed under an incidental contract is subject to the following additional exclusions:
(1) to bodily injury or property damage for which the insured has assumed liability under any incidental contract, if such injury or damage occurred prior to the execution of the incidental contract.
And thirdly, there is:
CONTRACTUAL LIABILITY INSURANCE COVERAGE
1. The company will pay on behalf of the insured all sums which the insured, by reason of contractual liability assumed by him under a contract designated in the schedule for this insurance, shall become legally obligated to pay as damages because of
Coverage Y. bodily injury or
Coverage Z. property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
This insurance does not apply:
....
(h) to loss of use of tangible property which has not been physically injured or destroyed resulting from
(1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or
(2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured.
(i) to property damage to the named insured's products arising out of such products or any part of such products;
....
(k) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.
The court then stated its reasons for entering judgment in favor of Penn. General:
Upon consideration of the policy definition of "property damage," the Court concludes that loss of the contract with Owl Biomedical, loss of profits, and loss of national distribution and advertisements does not constitute "property damage" and therefore there is no coverage afforded under the policy for legal obligations predicated on those items of damage.
After application of the definition of property damage there remain claims of damage to and loss of use of the motors and expense in recovery and attempted repair caused by the defective operation of the motors.
Upon consideration of the SMP and Incidental Contract coverages, the Court concludes that damages to the motors falls within exclusion (n) to those coverages and that damages for recovery and attempted repair, and for loss of use fall within exclusion (p).
Upon consideration of the Contract Liability Coverage for purchase order agreements, the Court concludes that loss of use falls within exclusion (h)(2) to that coverage, and that damage to the motors falls within exclusion (i) and expense *1341 for recovery and attempted repair falls within exclusion (k).
In its order, the trial court failed to specifically address the threshold question of whether there was an "occurrence." When asked to determine whether there was an "occurrence" in Cotton States Mutual Insurance Co. v. Norrell Heating & Air Conditioning Co., 370 So.2d 270 (Ala. 1979), this Court stated:
The definition of "occurrence," read in conjunction with the definition of products hazard coverage, clearly shows that "reliance upon a representation or warranty" is an "occurrence" covered by the policy.
Id. at 275. The relevant definitions in the policy in the case at bar are identical to those in Norrell. Therefore, we hold that there was an "occurrence" in this case.
Regarding "property damage," the trial court points out that there were no allegations in the complaint of any physical damage to the treadmills. From aught that appears in the complaint, the only physical damage done was to the motors themselves, and recovery for this is barred by exclusions (i) and (n), which are identical, and are commonly referred to as the "work product exclusion".
At the outset, we address the fact that the complaint did not contain any allegations of physical damage to the treadmills. This Court was faced with a similar problem in Bischoff v. Thomasson, 400 So.2d 359 (Ala.1981), and stated:
As provided in Rule 15(b), ARCP:
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. [Emphasis added.]
This Court has found implied consent where an opposing party fails to object to the introduction of evidence raising the disputed issue. See McDuffie v. Hooper, 294 Ala. 293, 315 So.2d 573 (1975); Rafield v. Johnson, 294 Ala. 235, 314 So.2d 695 (1975). As noted in the Committee Comments to Rule 15, ARCP, "Under the rule where evidence is introduced or an issue raised with the express consent of the other party, or without objection from him, the pleadings `shall' be deemed amended to conform to such evidence [emphasis added]."
400 So.2d at 363. Thus, applying our reasoning in Bischoff to the facts of this case, even though the complaint contained no allegations of physical damage to the treadmills, it is deemed to have been amended to conform to the evidence presented. There was evidence presented that when the motor malfunctioned, some of the components in the control unit on the treadmill were oftentimes damaged beyond repair. Also, there was proof that approximately 90 per cent of the treadmills in which the motor malfunctioned could not be refurbished and were simply thrown away. In light of the foregoing evidence not objected to, it is clear that the complaint in this case must be deemed to have been amended to conform to the evidence of physical damage to the treadmills which was offered at trial.
We now focus our attention on the trial court's conclusions with regard to the applicability of the various exclusions of the policy. The court correctly found that damages to the motors falls within exclusions (i) and (n). However, the treadmills also suffered "property damage," or "physical injury ... including the loss of use thereof." Exclusions (i) and (n), inasmuch as they pertain only to the work product of the insured, Scott Air, are inapplicable. Furthermore, in United States Fidelity & Guar. Co. v. Andalusia Ready Mix, Inc., 436 So.2d 868 (Ala.1983), this type of damage was held to be covered under a policy similar to that in the instant case. In Andalusia Ready Mix, defective grout was used in the construction of a water sewage *1342 treatment plant, and, as a result, the plant itself had to undergo extensive repairing and remodeling. Citing United States Fidelity & Guar. Co. v. Bonitz Insulation Co., 424 So.2d 569, 573 (Ala.1982), this Court stated:
"if [an] occurrence or accident causes damage to some other property than the insured's product, the insured's liability for such damage becomes the liability of the insurer under the policy."
436 So.2d at 870. Therefore, Penn. General is obligated to pay any judgment based on the damages to the treadmills.
In its final judgment, the court also concluded that loss of use falls within exclusion (h)(2); however, it appears that the court did not consider the exclusion in its entirety when it made this decision. The court set out the first two parts of the exclusion, but failed to include the last section, which reads:
But this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work had been put to use by any person or organization other than an insured.
It is clear from this language that the exclusion does not apply because the insured's work product, the motors, caused the loss of use of other tangible property, the treadmills, after the motors had been put to use by someone other than Scott Air, or FEC. According to the terms of the policy, therefore, recovery of damages resulting from the loss of use of the treadmills is not barred by this exclusion.
The court also erred when it concluded that damages for recovery and repair are barred by exclusions (p) and (k). These exclusions contain the same language, and are commonly known as the "sistership exclusion". The sistership exclusion is discussed in 3 R. Long, The Law of Liability Insurance, § 15, (1981):
The name derives from an occurrence in the aircraft industry where all airplanes of a certain make and type were grounded by an order of the Civil Aeronautics Administration because one crashed and others were suspected of having a common structural defect. The damages arising out of the loss of use of all the sister ships were enormous.
The recall of equipment or parts discovered to have a common fault involves expenses incurred to prevent accidents which have not occurred. While the insurance covers damages for bodily injuries and property damage caused by the product that failed, it was never intended that the insurer would be saddled with the cost of preventing other failures, any more than it was intended that the insurer would pay the cost of preventing the first failure if the product had been discovered to be in a dangerous condition before the occurrence.
In the case at bar, there was no withdrawal of the products from the market. FEC simply repaired those machines that were sent to it, but it in no way called for a total withdrawal of all its treadmills in an attempt to prevent future accidents. Although Alabama courts have not heretofore specifically addressed the issue of whether a total recall is required, an excellent discussion of the sistership exclusion is found in Paper Machinery Corp. v. Nelson Foundry Co., 108 Wis.2d 614, 323 N.W.2d 160 (1982):
Analyzing the exclusion on which Royal Globe relies, it is clear that Paper Machinery has claimed and been awarded "damages ... for ... replacement ... of the named insured's [Nelson's] products." By the plain meaning of the exclusion, however, such damages are excluded from coverage only if the insured's products "are withdrawn from the market or from use because of any known or suspected defect or deficiency therein." That is not the situation in this case. Paper Machinery never withdrew the defective mandrels from the market because of known or suspected defect. It replaced customer's mandrels only if and when they broke. We reject Royal *1343 Globe's characterization of this replacement as a recall or withdrawal of the mandrels from the market. There is no evidence in the record that Paper Machinery ever contacted any of its customers and advised them of its replacement policy or of suspected defects, or otherwise initiated the replacement of defective mandrels. Paper Machinery merely replaced mandrels when informed of breakage in the field. This does not constitute a withdrawal from the market by it, but a mere honoring of warranty obligations if and when defects became known.
108 Wis.2d at 620, 323 N.W.2d at 163. See also Yakima Cement Products v. Great American Insurance Co., 22 Wash.App. 536, 590 P.2d 371 (1979), reversed on other grounds, 93 Wash.2d 210, 608 P.2d 254 (1980). Without such a withdrawal from the marketplace, the exclusion does not apply, and Penn. General is obligated to pay for any damages which resulted from FEC's repair and replacement of its treadmills.
Finally, the trial court held that FEC could not recover damages for loss of the contract with Owl Biomedical, loss of profits, and loss of national distribution and advertisement, because they do not constitute "property damage" as defined in the policy. FEC claims that these losses which it suffered were consequences of the physical "property damage" that was done to the treadmills. Its claim is supported by R. Long, The Law of Liability Insurance, which states:
Where the policy provisions insure against liability arising out of specific operations, and expressly cover liability hazards of products and completed operations, the coverage is not limited to detectable physical damage which may result to other property from contact with goods or products of the insured.
Consequential damages, even including diminution of property values caused by the use or application of a defective, deficient, or inferior product, come within the scope of such policy. It is an established principle that consequential or intangible damages, as well as physical damages to other property, are within the terms of such an insuring agreement.
2 R. Long, The Law of Liability Insurance § 11.09 (1981). See also Yakima Cement Products v. Great American Ins. Co., supra. In accordance with the above, the court in Aetna Cas. & Sur. Co. v. General Time Corp., 704 F.2d 80 (2d Cir.1983), held that once physical damage to property other than that of the insured was found, loss of profits was covered as consequential damages of the physical damage. The court also noted that the majority of jurisdictions follow this interpretation.
Based upon the above-cited authority, we are of the opinion that FEC may recover damages for the loss of profits as well as the other consequences of having had its contract cancelled as a result of Scott Air's defective motors.
For all of the reasons stated above, the judgment of the trial court is reversed and the cause remanded for that court to enter a judgment consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
TORBERT, C.J., and MADDOX, FAULKNER, ALMON and HOUSTON, JJ., concur.

ON APPLICATION FOR REHEARING
ADAMS, Justice.
OPINION CORRECTED; APPLICATION OVERRULED.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.