[No. 13944-8-II. Division Two. April 8, 1992.]

AETNA CASUALTY AND SURETY COMPANY, *Respondent,* v.
M&S INDUSTRIES, INC., ET AL, *Appellants.*

*William H. Dunn, Jr., H. Peter Sorg, Jr.,* and *Lane Powell Spears Lubersky; Dexter A. Washburn* and *Mikkelborg, Broz, Wells & Fryer,* for appellants.

*Jan K. Kitchel* and *John A. McHugh,* for respondent.

ALEXANDER, J. — This is an appeal from a determination that Aetna Casualty and Surety Company did not insure against claims brought by Four Seasons, Inc., and Form-Tec, Inc., against M&S Industries, Inc., Aetna's insured. Four Seasons, a Canadian manufacturer of concrete form systems used in heavy construction, and Form-Tec, its United States product distributor, sued M&S for supplying allegedly defective plywood panels used in the manufacturing process. Initially uncertain whether its policy provided coverage, Aetna ultimately took the position that it did not, and filed this declaratory judgment action seeking an adjudication of the question. The Superior Court agreed with Aetna and granted summary judgment in Aetna's favor. We reverse.

M&S Industries, located in Vancouver, Washington, is a supplier of plastic-coated plywood panels. M&S advertised the superiority of its products, and Four Seasons was sufficiently impressed by the promotional literature to purchase a large quantity of 2 by 8 and 4 by 8 plywood panels from M&S in 1986. Four Seasons manufactures "engineered concrete form systems". In the manufacturing process, Four Seasons cuts plywood panels into widths ranging from 4 to 24 inches, drills and notches them, attaches rows of metal support bars, affixes latches, and applies a moisture sealer to the edges. When the form system is complete, a contractor responsible for pouring the foundation at a construction site can stand the forms on edge, connect them together in a line using the latches, adjust the thickness of the foundation by using spacers to connect the inside and outside form walls, and pour concrete into the form thus created. After the concrete dries, the forms can be stripped away and reused for another pour. A well-made form system can be used hundreds of times. The underlying problem in this case is that, despite the claims made by M&S in its promotional campaigns, the plywood panels it supplied to Four Seasons were of poor quality.

Four Seasons sold form systems made with M&S panels, through Form-Tec, to a number of contractors. Within weeks, the contractors began complaining to Four Seasons about peeling or "delamination" of the plastic facing on the forms, separation of the plywood lamination itself, warpage, and insufficient strength to contain a concrete pour. Four Seasons recalled the defective forms from the market and offered to replace them with forms made of plywood obtained from another supplier.

Four Seasons and Form-Tec demanded compensation for their damages in a letter sent to M&S in December 1986. They itemized damages of $274,000 incurred by Four Seasons and $95,000 incurred by Form-Tec, consisting of the costs of replacing the defective forms, lost profits on the sale of those forms, and lost profits on other sales not made because of the need to divert production to replacement forms. M&S referred the demand letter to Aetna, its liability insurance carrier. A claims representative in Aetna's Portland, Oregon, office responded that Aetna would provide a complete defense, subject to a reservation of rights concerning any alleged damage to M&S's own product, "which is ordinarily not covered."

Four Seasons and Form-Tec ultimately sued M&S and its owners, Gene Weber and Roland Mill, in federal court in the Western District of Washington. The plaintiffs alleged, *inter alia*, breach of contract, breach of warranty, negligence, and violations of the Washington Consumer Protection Act. M&S referred the complaint to Aetna. The claims department in Aetna's Seattle office, which had taken over the file, reserved the right to reject coverage on the ground that most, if not all, of the claimed damages fell within the policy's exclusion for damage to the insured's own product.[1] Aetna continually expressed doubts about coverage and

---

[1] Aetna retained a Seattle law firm to defend M&S pending a fuller evaluation of the coverage issue, although it apparently never offered more than $25,000 in settlement because of its doubts about coverage and its belief that the plaintiffs had not documented their consequential damages, *i.e.*, lost profits and business opportunities.

rejected a proposal by the plaintiffs wherein Aetna would pay $370,000 to settle the lawsuit. Aetna refused, during further negotiations, to contribute significantly to any settlement between the parties.

In light of Aetna's refusal, the parties entered into a settlement of their federal court lawsuit.[2] Consequently, Four Seasons and Form-Tec took an essentially unopposed judgment in federal court against these defendants in the amount of $564,972. Aetna filed the instant declaratory judgment action in Clark County Superior Court to obtain a determination of coverage.

The Superior Court ruled that Aetna's liability policy did not cover the damages claimed against M&S. It decided that the plywood panels "did not perform as anticipated as [they] proceeded to separate, warp, or become unusable after short usage. Aetna did not become a guarantor of the product, [but provided insurance] only if the product caused loss to others or their property." The Superior Court entered summary judgment in Aetna's favor, and this appeal followed.

■ The facts are not in dispute. On review of a summary judgment construing an insurance policy, we stand in the shoes of the trial court and decide whether the prevailing party, here Aetna, is entitled to judgment as a matter of law. *Guelich v. American Protec. Ins. Co.*, 54 Wn. App. 117, 118, 772 P.2d 536 (1989). The applicable general principles of construction are these:

> An insurance policy is a contract, and the rules regarding its construction are basically the same as those covering other contracts. *Stanton v. Public Employees Mut. Ins. Co.*, 39 Wn.

---

[2]The basic terms of the settlement were as follows: (1) Four Seasons and Form-Tec agreed to accept $60,000 from M&S; (2) M&S agreed not to oppose the plaintiffs' proof of liability and damages in federal court; (3) in the event of judgment against M&S and the individual defendants, M&S promised to "pursue all of their rights against Aetna to obtain payment of the judgment and all costs incurred by Defendants by reason of Aetna's refusal to.defend or settle Plaintiffs' claims"; (4) the plaintiffs would not execute upon any judgment entered in federal court against the defendants, but if defendants succeeded in recovering from Aetna less than $370,000, they would pay plaintiffs the difference between the amount recovered and the smaller of $370,000 or the amount of plaintiffs' federal court judgment, to a cap of $150,000.

App. 904, 907, 697 P.2d 259, *review denied*, 103 Wn.2d 1039 (1985). A court must look first to the contract to determine the parties' intent. *Greer v. Northwestern Nat'l Ins. Co.*, 109 Wn.2d 191, 197, 743 P.2d 1244 (1987). Clear language must be given effect according to its plain meaning, and a court may not construe such language. *Felice v. St. Paul Fire & Marine Ins. Co.*, 42 Wn. App. 352, 356, 711 P.2d 1066 (1985), *review denied*, 105 Wn.2d 1014 (1986). In interpreting a policy, the language must be given a fair, reasonable, and sensible construction. *E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.*, 106 Wn.2d 901, 907, 726 P.2d 439 (1986). It should be interpreted as it would be understood by the average purchaser of such a policy. *See Ames v. Baker*, 68 Wn.2d 713, 716, 415 P.2d 74 (1966). . . .

*Boggs v. Whitaker, Lipp & Helea, Inc.*, 56 Wn. App. 583, 585, 784 P.2d 1273, *review denied*, 114 Wn.2d 1018 (1990).

## POLICY COVERAGE

M&S purchased a comprehensive general liability policy from Aetna. The policy insures against property damage caused by an occurrence for which the insured is found legally obligated to pay damages. The policy defines "property damage" as (1) physical injury to or destruction of tangible property, or (2) loss of use of tangible property caused by an occurrence. "Occurrence", in turn, is defined to mean an accident that results in unexpected or unintended bodily injury or property damage.

■■ When an insurer issues a general liability policy, it is not issuing a performance bond, product liability insurance, or malpractice insurance. *Westman Indus. Co. v. Hartford Ins. Group*, 51 Wn. App. 72, 80, 751 P.2d 1242, *review denied*, 110 Wn.2d 1036 (1988). Consequently, the type of policy at issue here insures against damage to tangible property of another, not the insured's product. *Guelich v. American Protec. Ins. Co., supra*; *Marley Orchard Corp. v. Travelers Indem. Co.*, 50 Wn. App. 801, 750 P.2d 1294, *review denied*, 110 Wn.2d 1037 (1988); *General Ins. Co. of Am. v. International Sales Corp.*, 18 Wn. App. 180, 184, 566 P.2d 966 (1977), *review denied*, 90 Wn.2d 1010 (1978).

Thus, the difficulty in deciding the coverage issue lies in determining whether the deterioration of the plywood panels

supplied by M&S caused damage to the tangible property of anyone else. The cases addressing this issue have established that if the property damage is confined to the insured's defective product itself, a comprehensive general liability policy provides no coverage. *Yakima Cement Prods. Co. v. Great Am. Ins. Co.*, 93 Wn.2d 210, 608 P.2d 254 (1980) (defective concrete panels made by insured caused no damage to owner's roof); *Federated Serv. Ins. Co. v. R.E.W., Inc.*, 53 Wn. App. 730, 770 P.2d 654 (1989) (defective "Isoboard" incorporated by insured into construction of fruit storage structure; insurer conceded coverage for damage to stored apples, but coverage excluded for costs of replacing insured's own "Isoboard"); *General Ins. Co. of Am. v. International Sales Corp.*, *supra* (defective epoxy coating provided by insured caused no damage to metal pipe when it peeled off after application). *Cf. Hauenstein v. St. Paul-Mercury Indem. Co.*, 242 Minn. 354, 65 N.W.2d 122 (1954) (defective plaster applied to building walls by contractor; coverage excluded for damage to plaster itself, but not excluded for diminution in market value of building or cost of removing defective plaster and restoring building). On the other hand, coverage is present where the defective product causes damage to another person's tangible property, *Marley Orchard Corp. v. Travelers Indem. Co.*, *supra*; *Federated Serv. Ins. Co. v. R.E.W., Inc.*, *supra*, and the coverage also extends to consequential damages resulting directly from such injury. *Yakima Cement Prods. Co.*, 93 Wn.2d at 219; *Marley Orchard Corp.*, 50 Wn. App. at 807.

Aetna argues that the only property damage caused by the failure of the plywood panels was to the panels themselves — its insured's product — and that nobody else suffered any property damage. We read the record differently.

■ M&S supplied basic, plastic-coated sheets of plywood to Four Seasons. Four Seasons converted the plywood panels into an entirely different product designed to contain poured concrete in a variety of heights, lengths, and thicknesses. Four Seasons cut the panels into different sizes, cut notches and holes into them so spacers could be attached,

added metal support bars and latches, and applied a sealer. The plywood was only one component of the finished product, just as sheet metal is but one component of the bed on a pickup truck. The finished form sold by Four Seasons to contractors was much more than a sheet of plywood; it was a manufactured product with a particular function. Consequently, the defects in the plywood panels affected the entire form system. The forms came apart, they warped, they lost strength, and they could not be reused with anything like their promised frequency or the industry standard. Clearly, M&S's panels caused damage to the tangible property of another, Four Seasons. Thus, we can easily distinguish those cases in which the defects in the insured's product caused damage to that product itself, *e.g.*, *Yakima Cement Prods. Co. v. Great Am. Ins. Co.*, *supra*; *Federated Serv. Ins. Co. v. R.E.W., Inc.*, *supra*. The defective plywood panels provided by M&S caused damage to the concrete form systems manufactured by Four Seasons, so absent an exclusion from coverage, Aetna's policy applies.

### EXCLUSIONS

 Aetna invokes several policy exclusions in an effort to avoid coverage. Exclusion clauses subtract from coverage, and each exclusion is to be read with the insuring contract, independently of any other exclusions. *Harrison Plumbing & Heating, Inc. v. New Hampshire Ins. Group*, 37 Wn. App. 621, 627, 681 P.2d 875 (1984). Exclusionary clauses are to be "most strictly" construed against the insurer in view of the fact that the purpose of insurance is to insure, and the contract should be construed so as to make it operative rather than inoperative. *Phil Schroeder, Inc. v. Royal Globe Ins. Co.*, 99 Wn.2d 65, 68, 659 P.2d 509 (1983), *modified on reconsideration*, 101 Wn.2d 830, 683 P.2d 186 (1984).

██ Exclusion (p) of the policy, known as a "sistership" exclusion,[3] provides that the policy does not apply:

---

[3]This exclusion is called the "sistership" exclusion because it applies where products are recalled from the market because of known defects in their sister products. *Imperial Cas. & Indem. Co. v. High Concrete Structures, Inc.*, 858 F.2d

(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein; . . ..

As stated in *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 43, 811 P.2d 673 (1991), the intent of this exclusion is as follows:

while the insurance covers damages for bodily injuries and property damage caused by the product that was defective or failed, it was never intended that the insurer would be saddled with the cost of preventing such defects or failures any more than it was intended that the insurer would pay the cost of avoiding the defect in the first place or preventing the first failure if the product had been discovered to be in a defective or dangerous condition before the occurrence.

(quoting 2 R. Long, *Liability Insurance* § 11.09[3], at 11-99 (1990)). The insurer is not liable, therefore, for the cost of preventative or curative action taken by its insured. *Olympic Steamship*, 117 Wn.2d at 43 (citing *Yakima Cement Prods. Co. v. Great Am. Ins. Co.*, 22 Wn. App. 536, 542, 590 P.2d 371 (1979), *rev'd on other grounds*, 93 Wn.2d 210, 608 P.2d 254 (1980)).

This exclusion does not negate coverage, however, when a third party, rather than the insured, removes the insured's product from the market. In that event, coverage is still present because the interests of the parties are fairly balanced: The insurer does not bear the cost of an insured's curative or preventative measures, but the insured retains protection against a foreseeable element of claims that commonly arise when the insured's product must be withdrawn from the market. *Olympic Steamship*, 117 Wn.2d at 48.

---

128, 136 (3d Cir. 1988). The exclusion is derived from the practice observed in the airline industry of grounding all "sister" aircraft of a particular type when a defect in one of them is suspected of causing an accident. In that situation, the potential damages arising from loss of use of the sisterships are enormous, and the exclusion confines coverage to damages arising from the defect in the aircraft that crashed. *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 43, 811 P.2d 673 (1991).

The sistership exclusion does not apply in this case for two reasons. First, no defective "sister" panels were withdrawn from the market because of anyone's fears that they, too, would prove defective after the defects first came to light. Panels were withdrawn and replaced only after customers complained of defects in the panels delivered to them. Second, it was third parties — Four Seasons and Form-Tec — who withdrew the products, not the insured party, M&S.

Aetna's brief also mentions exclusion (n), a "work product" exclusion. That exclusion applies "to property damage to the named insured's products arising out of such products or any part of such products; . . .". This language comports with the case law, discussed above, holding that a policy of this kind does not cover damage to the insured's own products that prove defective. As we have said, this case involves damage to other tangible property as well. Thus, this exclusion obviously does not negate coverage. *See also Firemen's Ins. Co. v. Bauer Dental Studio, Inc.*, 805 F.2d 324 (8th Cir. 1986) (insured made and sold dental crowns to dentist who ground and polished them to fit individual patients. Patients complained of cracked crowns. Exclusion did not negate coverage because the completed crowns were a composite product that was not solely the insured's work); *Imperial Cas. & Indem. Co. v. High Concrete Structures, Inc.*, 858 F.2d 128 (3d Cir. 1988) (insured supplied steel strips to manufacturer of washers, who stamped washers out of the steel and forwarded them for heat treatment for ultimate use in automotive industry. Insured's steel was defective, so that heat treatments resulted in defects in washers. Exclusion did not negate coverage because the washers were a new product with greater value than the steel itself); *Pittsburgh Plate Glass Co. v. Fidelity & Cas. Co.*, 281 F.2d 538 (3d Cir. 1960) (insured supplied paint to manufacturer of venetian blinds, who baked paint onto the blinds. Damages caused when paint peeled off the blinds were not excluded from coverage because once the paint was baked onto the

steel blinds and became part of the finished product, it was no longer the insured's product).

Finally, Aetna's policy contains an exclusion for "loss of use" damages, which states that insurance is not provided for:

> (m) . . . loss of use of tangible property which has not been physically injured or destroyed resulting from
> > (1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or
> > (2) the failure of the named insured's product or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;
>
> but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured; . . ..

This exclusion is difficult to parse, but we interpret it to exclude coverage when either: (1) the named insured delays or fails to perform the contract or (2) the insured's products or work fails to meet the standards warranted by the contract, resulting in the loss of use of another's tangible property that has not been physically injured or destroyed. However, coverage still exists ("this exclusion does not apply") if someone else has put the insured's products or work to use and, thereafter, a loss of use of other tangible property results from "sudden and accidental physical injury to or destruction of" the insured's products or work.

■ This exclusion clearly does not apply either. It applies only to "loss of use of tangible property which has not been physically injured or destroyed." The property of Four Seasons — the concrete forms — *was* physically injured by the defects in M&S's product. This result is consistent with the purpose of a comprehensive general liability policy: to insure against liability damage to another's property. *Marley Orchard Corp.*, 50 Wn. App. at 806. The policy provides that such damage includes the loss of use of the tangible property. *See Guelich v. American Protec. Ins. Co., supra.*

Aetna argues, in addition, that it is not liable for the advertising injuries suffered by Four Seasons and Form-Tec and for which they claim coverage under a policy endorsement. The advertising injury endorsement states that Aetna will pay for "advertising injury" arising out of the conduct of the insured's business. An umbrella extension of the policy limits refers to "advertising offense", defined as injury arising out of the named insured's advertising activities "if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition . . .". Washington's Consumer Protection Act, in RCW 19.86.020, declares unlawful all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce". Four Seasons claimed and recovered damages in federal court for "unfair competition" in the form of M&S's misleading and deceptive advertising and violations of the Consumer Protection Act.

The policy language does not cover these damages. Four Seasons and Form-Tec recovered for violations of the CPA and for misleading and deceptive advertising. The policy definition of "advertising offense" includes "unfair competition", but the unfair competition condemned by the CPA consists only of acts directed at competitors. *Boggs*, 56 Wn. App. at 586. M&S was a supplier to Four Seasons and Form-Tec, not their competitor. Unfair and deceptive practices that are harmful to consumers can also constitute unfair competition under the CPA, but this type of general liability policy does not cover such practices unless competitors are harmed. *Boggs v. Whitaker, Lipp & Helea, Inc.*, 56 Wn. App. 583, 586-88, 784 P.2d 1273, *review denied*, 114 Wn.2d 1018 (1990).

## DUTY TO DEFEND

An insurer is obliged to defend any complaint alleging facts that, if proved, would render the insurer liable. *State Farm Gen. Ins. Co. v. Emerson*, 102 Wn.2d 477, 486, 687 P.2d 1139 (1984). The duty does not hinge on the insured's potential liability to the claimant, but on whether

the complaint alleges any facts rendering the insurer liable to the insured under the policy language. Claims that are clearly not covered by the policy relieve the insurer of its right and duty to defend. *Emerson*, 102 Wn.2d at 486. The pleadings must be liberally construed, and if they are subject to an interpretation that creates a duty to defend, the insurer must comply with that duty. *R.A. Hanson Co. v. Aetna Ins. Co.*, 26 Wn. App. 290, 294, 612 P.2d 456 (1980).

The amended complaint filed by Four Seasons and Form-Tec clearly gave rise to a duty to defend when M&S tendered the complaint to Aetna. The complaint states that M&S's plywood panels "exhibited high incidence of defects, excessive warpage and delamination", resulting in complaints, nonpayment, and cancellation of orders by customers of Four Seasons and Form-Tec. Because the policy covers claims for damage to the tangible property of Four Seasons and Form-Tec, plus consequential damages causally related to the property damage, *Marley Orchard Corp.*, 50 Wn. App. at 807, Aetna had a duty to defend.

Aetna's duty to defend extended, thus, to Four Seasons and Form-Tec's claims against M&S for direct and consequential damages resulting from the defective plywood panels delivered by M&S. It did not extend to advertising injuries or to the claimed violations of the Consumer Protection Act, for reasons explained above, and it did not extend to claims made individually against Roland Mill and Gene Weber for allegedly engaging in a fraudulent transfer of M&S assets. We have not been directed to any policy language covering the latter claim.

Aetna breached its duty to defend the claim for damages resulting from the defective panels by persistently denying coverage. Because the policy provides coverage and the exclusions do not apply, Aetna must pay all damages, direct and incidental, stemming from the claims for those damages.[4] *Bosko v. Pitts & Still, Inc.*, 75 Wn.2d 856, 454

---

[4]By virtue of their settlement, the federal court plaintiffs, Four Seasons and Form-Tec, stand to benefit from the policy's coverage of some of their claims. We assume that the insured remains principally interested in Aetna's duty to

P.2d 229 (1969). Unfortunately, the plaintiffs' judgment in federal court did not segregate damages to particular theories of recovery. We cannot determine how much of the total judgment pertains to the claims covered by the policy and how much is not covered according to our analysis. The trial court will have to resolve that question.

The appellants, relying on *Olympic Steamship,* 117 Wn.2d at 52-54, request an award of attorney's fees on appeal. We deny the request except insofar as it relates to fees incurred by M&S. Although *Olympic Steamship* holds that an insurer who refuses to defend or pay a justified claim must reimburse fees incurred by its insured to defend the claim, the case does not hold that the insurer must pay the fees incurred by a judgment creditor of the insured. Here, we have held that Aetna had a duty to defend certain claims against its insured, M&S, but did not have to defend the uncovered claims brought against Mill and Weber, individually. The other appellants, Four Seasons and Form-Tec, are simply not Aetna's insureds. They contend that they stepped into the shoes of the insured, M&S, "to compel the insurer's payment obligation" and are thereby entitled to their fees on appeal. We disagree. The agreement settling the federal court lawsuit expressly placed the burden on M&S to pursue Aetna for payment of the judgment, and it placed a cap on M&S's liability. Therefore, even if Four Seasons and Form-Tec have really been the ones to shoulder the burden of establishing coverage in this appeal, their efforts have obviously been at least as much for their own benefit as for M&S's. The judgment creditors have not truly stepped into the shoes of the insured and cannot claim the benefit of *Olympic Steamship* for purposes of obtaining attorney's fees on appeal.

The summary judgment in Aetna's favor is reversed, and the cause is remanded to superior court with instructions to determine the dollar amount of Aetna's obligation under the

---

defend because of the expenses it incurred separately in defending the plaintiffs' claims.

policy, plus a reasonable attorney's fee and costs of defense related to the covered claims, including a reasonable fee to M&S for legal services on appeal.

PETRICH, C.J., and SEINFELD, J., concur.